

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

- - -

STEPHANIE MRAZ,                  )       CIVIL ACTION
                    Plaintiff,   )       Civil Action
                                 )       No. 05-129
          v.                     )
                                 )
MR. TILE, INC. and SANFORD       )
COOPERMAN, Individually as       )
owner and operator of            )
MR. TILE, INC.,                  )
                    Defendants.  )

- - -

DEPOSITION

of STEPHANIE MRAZ taken in behalf of the Defendants in
the above-entitled cause pursuant to the Federal Rules
of Civil Procedure before Domenica Vogel, a notary
public, at The Lindsay Law Firm, 128 South Main
Street, Butler, Pennsylvania 16001, on Tuesday, April
25, 2006, commencing at 12 noon.

- - -

APPEARANCES:

          EDITH LYNNE SUTTON, ESQ., 11 Sunset Court,
Cranberry Township, Pennsylvania 16066, appearing in
behalf of the Plaintiff.

- - -

---

2

1  APPEARANCES (Continuing)
2          BETHANN R. LLOYD, ESQ., Grogan Graffam, Four
3  Gateway Center, 12th Floor, Pittsburgh, Pennsylvania
4  15222, appearing in behalf of the Defendants.
5                         - - -
6                        INDEX
7  WITNESS:          EXAMINED BY:          PAGE:
8  Stephanie Mraz    Ms. Lloyd               3
                     Ms. Sutton            119
9                    Ms. Lloyd            129
                     Ms. Sutton            131
10                        - - -
11                      EXHIBITS
12
   FOR THE DEFENDANTS:        MARKED FOR IDENTIFICATION:
13
   Exhibit No. 1                          15
14 Exhibit No. 2                          35
   Exhibit No. 3                          56
15 Exhibit No. 4                          72
   Exhibit No. 5                          75
16 Exhibit No. 6                          88
17                        - - -
18                    STIPULATION
19          It is stipulated and agreed by and between
20 counsel for the respective parties that the
21 inspection, reading and signing of the deposition may
22 be and are waived.
23                        - - -
24

---

3

1            P R O C E E D I N G S
2                    - - -
3                STEPHANIE MRAZ
4  having been first duly sworn, was deposed as follows:
5                  EXAMINATION
6  BY MS. LLOYD:
7      Q    Ms. Mraz, my name is Bethann Lloyd, and I
8  represent Mr. Tile and Mr. Cooperman in this case.
9          I am going to be asking you some questions
10 today.  I trust you have met with your attorney and
11 understand what we're here for.
12          The only thing I'll instruct you, if there
13 is a question that I ask that you don't understand,
14 will you please let me know.
15     A    Okay.
16     Q    What is your name?
17     A    Stephanie Mraz.
18     Q    And where do you currently reside?
19     A    Street address?
20     Q    Yes.
21     A    It's 266, Spartansburg, Pennsylvania.
22     Q    And how long has that been your address,
23 approximately?
24     A    Six months -- since September.

EXHIBIT

C

5

Stephanie Mraz - by Ms. Lloyd

1    Q    Where were you living when you worked for
2 Mr. Tile?
3    A    227 Meadow Street, Ford City.
4    Q    Any particular reason for the move to
5 Spartansburg?
6    A    I left my husband.
7    Q    Are you on any medications today that might
8 interfere with your ability to testify?
9    A    No.
10    Q    And my next question, are you married -- you
11 are still married at this point in time?
12    A    Yes.  We're legally separated.  Working on
13 it.
14    Q    Do you have any prior marriages?
15    A    No.
16    Q    And you have two children?
17    A    One.
18    Q    Just one child?
19    A    One.
20    Q    Is that Michael?
21    A    Yes.
22    Q    How old is he now?
23    A    Six.
24    Q    And who is the primary caregiver for Michael

Stephanie Mraz - by Ms. Lloyd

1 at present?
2    A    I am.
3    Q    What about at the time that you worked for
4 Mr. Tile?
5    A    Full time or when I came back from sick
6 leave?
7    Q    When you were working full time prior to
8 your leave, who was --
9    A    My in-laws.
10    Q    -- taking care of Michael?
11    A    My in-laws.
12    Q    One thing I'll caution you about is we can't
13 talk overtop of each other or the court reporter will
14 get a little angry with us.
15    A    I'm so sorry.
16    Q    I'll try not to interrupt you.  Sometimes
17 it's a little hard to judge if you are done with an
18 answer.  But make sure I finish as well.
19    A    Okay.
20    Q    Back at this time where you were working
21 full time with Mr. Tile before your leave, who was the
22 primary caregiver for Michael?
23    A    My in-laws.
24    Q    And what are their names?

6

Stephanie Mraz - by Ms. Lloyd

1    A    Mike and Lil Mraz.
2    Q    And where do they currently live?
3    A    1025 Fifth Avenue, Ford City.
4    Q    While you were on leave from Mr. Tile and
5 having some of your medical treatment, who was the
6 caregiver for Michael?
7    A    Can I generalize that answer?
8    Q    Sure.
9    A    It's a little difficult to explain.
10    Q    Go ahead.
11    A    I moved in with my grandmother in Grand
12 Valley, and myself as much as I was able, and then my
13 grandmother and subsequent family members came in to
14 care for Michael.
15    Q    Was your husband living with you at your
16 grandmother's house during your period of leave?
17    A    No, he -- only for six weeks.
18    Q    And then he was back to your normal address?
19    A    Correct.
20    Q    You weren't separated at that period of
21 time, were you?
22    A    No.
23    Q    When did you actually physically separate
24 and move out of the house?

7

Stephanie Mraz - by Ms. Lloyd

1    A    I'm trying to get my dates straight -- April
2 17, 2004.
3    Q    Are you claiming that the acts done to you
4 by Mr. Tile in any way led to your separation with
5 your husband?
6    A    Honestly, the stress and everything, yes, I
7 do believe pushed it to that, yes.
8    Q    I didn't know whether to probe into that
9 issue or not.  But since you said that it may have
10 impacted the stress, had you had any marital problems
11 during the period prior to your leave of absence with
12 Mr. Tile?
13    A    Can you be more specific?
14    Q    Had you ever had any talks of divorce, ever
15 separate prior to your leave from Mr. Tile?
16    A    No.
17    Q    What about during the seven or eight months
18 that you were on leave from Mr. Tile and getting the
19 medical treatment, did you have any problems, marital
20 problems, during that period of time?
21    A    How do I answer that one?  It was a very
22 stressful time for everyone.
23         MS. SUTTON:  Well -- excuse me.
24         THE WITNESS:  I don't know how to answer

9

Stephanie Mraz - by Ms. Lloyd

```
 1    that.
 2         MS. SUTTON:  Well, I think that Ms. Lloyd
 3    did a very good job of specifying what types of
 4    things she was looking for when she asked if you
 5    had marital difficulties prior to your illness.
 6         So I think you can probably apply that same
 7    standard.  Did you discuss divorce?  Did you
 8    separate physically other than because of the
 9    illness during that time?
10         THE WITNESS:  It wasn't brought up by me at
11    any point, the divorce.  But his family was
12    bringing in a few issues that, you know, but
13    really, no.
14         MS. SUTTON:  Not the two of you, though?
15         THE WITNESS:  He mentioned it at one point.
16    But due to family -- his family influence, it was
17    just because they wanted Michael.  They wanted to
18    care for Michael.  They didn't want him with me.
19         This is a very -- that's a very difficult
20    question for me to answer, you know, in response
21    to that.
22         Did I answer it?
23    BY MS. LLOYD:
24    Q    Yes, you did a good job.
```

Stephanie Mraz - by Ms. Lloyd

```
 1    A    Okay, I'm sorry.
 2    Q    Just so I understand the time frame.  Even
 3    while you were on leave from Mr. Tile, at least among
 4    his family, there was some talk about possible
 5    divorce?
 6    A    Yes.  They were trying to push him to that
 7    in order to get, you know, care of Michael.
 8    Q    Okay.  And during the period you were on
 9    leave from Mr. Tile, at least on one occasion it
10    sounds like your husband at least mentioned the idea
11    of a divorce?
12    A    Again, I don't want to --
13    Q    I'm just trying to make sure I understand.
14    A    Yeah, I mean, it was the stress of
15    everything that was going on, you know.  He did
16    mention it.  I mean, yeah, he did mention it.
17    Q    I assume the period where you were getting
18    medical treatment during your leave of absence from
19    Mr. Tile was a pretty stressful time for you?
20    A    Yes.
21    Q    Do you have any family support yourself here
22    in the area?
23    A    The Butler-Ford City area?
24    Q    Right.
```

10

Stephanie Mraz - by Ms. Lloyd

```
 1    A    No, I do not.
 2    Q    So the family members we've talked, these
 3    are all the in-law side -- correct -- your husband's
 4    father and mother, correct?
 5    A    That took care of me?
 6    Q    Right.
 7    A    No.
 8    Q    No, I'm sorry, I asked a poor question.
 9         The stressors that you have talked about on
10    the marriage, that came from your husband's side?
11    A    Yes.
12    Q    Did your husband's side of the family ever
13    get custody over your child?
14    A    No.  They threatened.
15    Q    And is that Mike and Lil Mraz?
16    A    Yes.
17    Q    Now, prior to your leave of absence back
18    when you were working full time with Mr. Tile, were
19    Mike and Lil Mraz taking care of Michael during the
20    day and then you were with him, you and your husband
21    were with him at night?
22    A    Yes.
23    Q    I just wanted to make sure when I asked
24    about the primary caregiver, he was living with his
```

11

Stephanie Mraz - by Ms. Lloyd

```
 1    mom and dad.  He was just being cared for by them
 2    during the day, correct?
 3    A    Correct.
 4    Q    And during your period of leave, who was
 5    taking care of Michael?
 6    A    My family up around the Erie area, my mom,
 7    my grandma, aunts, uncles, numerous relatives.
 8    Q    Where you had moved in to sort of recover
 9    and recuperate?
10    A    Where I had my treatments at, yes.
11    Q    When did you move back to your residence
12    after being at your grandmother's house?
13    A    After my treatments, I moved back to Ford
14    City.  It was January 11th of 2003.
15    Q    And were you and your husband living in the
16    residence at that period of time?
17    A    Yes.
18    Q    And Michael was with you at that period of
19    time?
20    A    Yes.
21    Q    Were you and your husband or one of you
22    taking care of Michael during the day?
23    A    Yes.
24    Q    Now, how old was he?  Was he two or three
```

Stephanie Mraz - by Ms. Lloyd

1 around that period of time?
2     A   Yes.
3     Q   Now, it's my understanding that your leave
4 of absence from Mr. Tile was on account of a cervical
5 cancer; is that correct?
6     A   Yes.
7     Q   Did you ask for leave from Mr. Tile?
8     A   I went to a doctor's appointment on
9 September 30th and was admitted to the hospital for
10 severe loss of blood and his initial diagnosis of
11 cancer somewhere.  He admitted me to the hospital.
12     My mom then called Mr. Tile and spoke with
13 Laree and told her I had been admitted to the
14 hospital.  They weren't sure what was going to go on.
15 I was going to be going for numerous tests in the next
16 couple of days.  And then, you know, she would then
17 keep everyone updated.
18     Q   The Laree that you mentioned, is that Laree
19 McKinley.
20     A   Yes.
21     Q   At some point after that initial diagnosis,
22 did you ask for a leave from Mr. Tile?
23     A   I never directly spoke with Mr. Tile.  My
24 initial diagnosis -- I went in for surgery and came

Stephanie Mraz - by Ms. Lloyd

1 out with my final diagnosis of cancer.  I was
2 initially diagnosed with one form of cancer.  They
3 went in to do the surgery for that and discovered it
4 was another type of cancer.
5     So I came out of surgery, went home for five
6 days.  I was in the state of shock.  My best
7 recollection, I don't remember -- I did not call
8 Mr. Tile and speak directly to anyone.  My mom did.
9     Q   Somehow you ended up on a leave of absence,
10 though?
11     A   Yes.  I'm not sure how that came about.  I
12 was in a state of shock.
13     Q   And it's my understanding that was from
14 around October of 2002 through the end of May of 2003;
15 is that correct?
16     A   Yes.  It was October 1st.
17     Q   After you got over the initial shock of the
18 diagnosis and you were into your leave in later
19 October or November, did you have any conversations
20 with Mr. Tile, anyone at Mr. Tile about the leave?
21     A   It was -- yes, I spoke -- we spoke numerous
22 times on the phone.  They gave me their 800 number to
23 call in and give them updates, which I did do
24 periodically.  It was just -- nothing was ever

Stephanie Mraz - by Ms. Lloyd

1 written.  It was just a verbal understanding of I was
2 going through my treatments, and I was, you know, up
3 there and we would just deal with everything when I
4 came back.
5     Q   Who did you speak with at Mr. Tile during
6 that period of time when you were off work?
7     A   Different employees, mainly --
8     Q   In terms of giving them updates about your
9 medical care, not just chitchat?  But who were you
10 actually in communications with about being off work
11 and details regarding work?
12     A   Regarding being -- I mainly spoke with Laree
13 giving her medical updates.  But really when I was off
14 on my treatments, we did not discuss, you know, my
15 returning to work, when I was coming back, anything
16 along those lines.  It was just to keep them updated
17 on what was going on with me.
18     Q   Were you getting paid any portion of your
19 salary during the period of time you were off work?
20 Did you receive some short-term disability benefits
21 for a period of time?
22     A   I believe so, yes.
23     MS. LLOYD:  I'm going to show you what we
24     we'll mark as Exhibit 1.

Stephanie Mraz - by Ms. Lloyd

1     (Whereupon, Defendants' Deposition Exhibit
2     No. 1 was marked for identification.)
3     - - -
4 BY MS. LLOYD:
5     Q   Is this what we've marked as Exhibit 1 a
6 letter that you wrote to the people at Mr. Tile and
7 Furniture World?
8     A   Yes.
9     Q   And you mailed it around April 24, 2003?
10     A   Yes.
11     Q   Is there any particular person you were
12 directing it to at Mr. Tile or was it just to
13 everyone?
14     A   This was a general note I wrote to, you
15 know, everyone who had sent me cards and whatnot.
16 This letter was opened by Laree McKinley and not
17 forwarded to anyone per my understanding at Mr. Tile.
18 I was told that by several employees that they never
19 saw this letter, this thank you note.
20     Q   It was essentially the reason that you were
21 thanking the people at Mr. Tile for the things
22 mentioned in here?
23     A   Correct.
24     Q   And I want to ask you about a couple of

Stephanie Mraz - by Ms. Lloyd

1 things in there.
2         It says that you received a basket of
3 flowers, a basket of goodies, all of your cards and a
4 money gift, and you said they were greatly
5 appreciated.
6         Who specifically sent you the basket of
7 flowers?
8    A    Mr. Tile, Furniture World as a whole.
9         I had two surgeries five days apart.  I
10 received -- excuse me -- the basket of flowers was
11 from my -- I had peritonsillar throat abscess in
12 September of that year.  The flowers were from then.
13        The basket of goodies was then from my
14 surgeries, the cervical surgeries.
15   Q    From the cancer?
16   A    Yes.
17   Q    Who sent you cards, the cards that you were
18 referring to in here?
19   A    Numerous employees.
20   Q    Did Laree McKinley send you cards?
21   A    I don't remember offhand.
22   Q    Did you get anything from Mr. Cooperman?
23   A    I do not remember.
24   Q    Did you get anything from Gary Klingensmith?

Stephanie Mraz - by Ms. Lloyd

1    A    Not to my recollection.
2    Q    Did you get anything from Jody Klingensmith?
3    A    If I'm not sure, what should I say?
4    Q    Tell me you are not sure.
5         MS. SUTTEN:  Exactly right.
6         THE WITNESS:  I'm not sure.  But I do have
7    cards that I received in a box, in my cancer box.
8    I do have those.
9         I know Deb Helman specifically sent me one.
10   Lois Holmes -- actually, I did receive one from
11   Lois, Debbie -- and I'm not sure exactly who
12   else.  Those two I do remember offhand.
13 BY MS. LLOYD:
14   Q    Did some of the people in management send
15 you cards and well-wishes during your period of leave?
16   A    Not that I remember.
17   Q    You received -- it says a money gift from
18 somebody at Mr. Tile.  Who did you receive the money
19 gift from?
20   A    That was from several of my co-workers
21 within the office.  They all put money -- they sent me
22 a card, and they all put money in the card and sent it
23 to me so I would have cash on hand at my grandmother's
24 house while I was recuperating.

---

18

Stephanie Mraz - by Ms. Lloyd

1    Q    Was that one of those type of things where a
2 bunch of people chip in from the company and give you
3 a gift of money to help you sort of recuperate and for
4 your cash needs for that period of time?
5    A    Yes.  I believe it was $8, which it was
6 greatly -- you know, it was appreciated.  But it was
7 mainly just my initial co-workers.
8    Q    Was there some sort of a walk also in your
9 honor or for the specific kind of cancer that you had?
10 Do you remember something like that where you were
11 walking around the track?
12   A    The annual "Relay for Life," Kittanning-Ford
13 City has one every year.  Mr. Tile did put up a sign
14 in my honor of, you know, with my name on it from
15 Mr. Tile employees.  But it was not a walk just for me
16 in my name or my benefit.  It was the annual "Relay
17 for Life" walk of that year.
18   Q    Did you walk with certain employees of the
19 company at that time?
20   A    No, I did not.
21   Q    Did Laree McKinley walk in that walk?
22   A    Yes.  She was on a separate "Relay for Life"
23 team that I was not aware of.  And I had joined a
24 different team.  And so we were on different teams.

---

19

Stephanie Mraz - by Ms. Lloyd

1    Q    Now, you have alleged -- do you have a copy
2 of your interrogatory responses there?  If not, I may
3 have some extra copies.
4    A    My responses?
5    Q    Right.  I have it right here.
6         Do you need one?
7         MS. SUTTON:  No, I don't need it.
8 BY MS. LLOYD:
9    Q    You were asked in Interrogatory No. 9 -- it
10 might just be easier if you just look off the copy I
11 made.
12        MS. SUTTON:  Maybe I'll grab yours.
13        MS. LLOYD:  Sure, No. 9.
14 BY MS. LLOYD:
15   Q    You were asked if you believed you were
16 discriminated against in any way by Mr. Tile,
17 Mr. Cooperman, during your leave of absence from
18 October of 2002 through May of 2003, and you put down
19 one instance of not getting a Christmas bonus.
20        The first thing I want to ask you about
21 that, do you believe you were discriminated in any
22 other way during your leave of absence?
23   A    Can you explain?
24   Q    Do you understand what I'm asking you?

Stephanie Mraz - by Ms. Lloyd

1    A    I'm not sure how to answer that.
2    Q    You have alleged that Mr. Tile and
3 Mr. Cooperman committed acts of discrimination against
4 you.  What I'm going to find out is did any of
5 those -- did they discriminate against you in any
6 fashion, by any act or any omission during the period
7 of your leave of absence?
8        MS. SUTTON:  Just answer truthfully.  Do you
9        think that they did or -- this is what your
10       response was.
11       THE WITNESS:  Okay.  You know, I do believe
12       to a point, yes.
13 BY MS. LLOYD:
14    Q    What did they do to discriminate against
15 you?  What did they do or not do that you perceived to
16 be discriminatory?
17    A    In this response?
18    Q    Well, you listed one example here.  I'm
19 trying to find out is this the only thing that was
20 done, or were there other acts or omissions that you
21 felt to be discriminatory during your leave?
22    A    During my leave?  I'm not sure what to say.
23       Do I need to explain this one further and
24 then go from there or --

---

Stephanie Mraz - by Ms. Lloyd                21

1    Q    That's fine, we can do it that way.  Where
2 does this one go?  Why do you think you were
3 discriminated against for not receiving a Christmas
4 bonus?
5    A    My thought on that is I was off fighting for
6 my life.  I left, you know, for a leave of absence
7 through no choosing of my own.  She was on an extended
8 maternity leave through her own choice to have a
9 child.  Why was I not given -- I worked nine full
10 months of the year sick.  Why was I not then given my
11 bonus for that subsequent year while I was off.  You
12 know, it was no choice of my own.  It was something I
13 had to deal with.
14    Q    Now, with respect to Heather McClafferty,
15 M-c-C-l-a-f-f-e-r-t-y, with respect to
16 Ms. McClafferty, do you know the circumstances of her
17 maternity leave such as how long she was off
18 specifically?
19    A    No, I do not.  I was told by Jody
20 Klingensmith that she had had some difficulty through
21 the pregnancy and she had gone on an extended
22 maternity leave.  And it was a known fact that she did
23 receive her Christmas bonus and year-end bonus.  And I
24 received neither.

---

Stephanie Mraz - by Ms. Lloyd                22

1    Q    Do you know how much she received?
2    A    Our bonuses were based on what you made at
3 the time and their profit for the year.  It did vary
4 depending on the employee.
5    Q    Do you know if Ms. McClafferty was working
6 or not working at the time the bonus was given
7 sometime in December or January of that year?
8    A    As it was explained to me, she was not
9 working.  She was off on her medical leave.
10    Q    Do you know approximately how long she was
11 off altogether?
12    A    That again I'm not sure.
13    Q    You don't know whether she was off longer
14 than you or shorter than you?
15    A    It was shorter than me.
16    Q    Is there anything you can cite me to, a
17 handbook, a policy, anything that has been told to you
18 that suggests that you are entitled to a bonus from
19 Mr. Tile each year?
20    A    Yes, I do believe it's in their -- I do
21 believe it's in their handbook under benefits and
22 full-time bonuses.  There is a description of medical,
23 maternity leave.
24    Q    I was looking for this last night.  I

---

Stephanie Mraz - by Ms. Lloyd                23

1 couldn't find anything specific to bonuses.  But I
2 wondered if I've missed something.
3    A    Again I'm not sure if it is specifically
4 stated, you know.
5    Q    What gives you the impression that you would
6 have been entitled to a bonus given that you hadn't
7 worked since October of 2002 that year?
8    A    The bonuses usually came out in November.  I
9 was gone for less than a month.  That bonus would have
10 been based on my working from January to the time of
11 my leave of absence in October, which again was
12 through no choice of my own.  It was a
13 life-threatening illness that I had to take care of.
14    Q    Had you received bonuses in every year since
15 you have been at Mr. Tile?
16    A    Yes.
17    Q    How much were those bonuses on average?
18    A    My previous year's Christmas bonus, I
19 believe it was either 500 or $900, just for my
20 Christmas bonus.  We also then got year-end bonuses
21 after our annual New Year's Day sale.  Those again
22 would vary depending on profits for the year.  Those
23 were also very substantial.  If I do remember
24 correctly, I do believe my previous year's bonus was

25

Stephanie Mraz - by Ms. Lloyd

1  $900.
2        Q    But just to ask again, I haven't found
3  anything in the handbook.  I'm not trying to trick you
4  here.  I haven't found anything on the bonus.  I know
5  I'm under pressure asking you to see if you can find
6  anything in there.
7              But my question is this:  You can't cite to
8  me any handbook or written policy or procedure
9  requiring Mr. Tile to give you a bonus when you are
10 not currently working for Mr. Tile, can you?
11       A    Right offhand, no.  I do believe on the
12 bottom of their sheet where they list, they listed --
13 they have done a revision within the business the year
14 before I got -- right before I got sick and listed a
15 zero to 90 days in their wage.  And I was thinking
16 that there was something written on the bottom of
17 that.  And that is in here somewhere.
18       Q    We can take a look for that maybe on a break
19 to see if that refreshes your memory on anything.
20       A    Okay.
21       Q    But other than that, you can't think of
22 anything in writing?
23       A    At this time no, I cannot.
24       Q    Did anybody orally promise you that you

Stephanie Mraz - by Ms. Lloyd

1  would be entitled to a bonus even though you hadn't
2  been working since early October of 2002?
3        A    It was never discussed.
4        Q    Were there any other acts of discrimination
5  against you other than this instance regarding the
6  bonus during your time of leave?
7        A    Not that I can think of at this time.
8        Q    Now, you returned to work at the end of May
9  of 2003; is that right?
10       A    Yes.
11       Q    Prior to that time, had you had some
12 discussions with Ms. Holmes about your schedule in
13 returning to work?
14       A    Yes.
15       Q    Did you talk with anyone else other than
16 Ms. Holmes about your schedule?
17       A    I spoke with Gary Klingensmith briefly, not
18 specifically regarding the schedule, but about
19 returning to work, kind of what was expected.  And his
20 initial response to me when I first -- when I was
21 finishing up going through radium implants and I still
22 wasn't sure when I would be returning, his response
23 was, you know, don't worry about that.  You just
24 concentrate on getting better.

26

Stephanie Mraz - by Ms. Lloyd

1        Q    When did you have that discussion with
2  Mr. Klingensmith?
3        A    I do not recall exactly.  It was somewhere
4  during the time of my radium implants which were March
5  or April.
6        Q    In any event, before you returned?
7        A    Yes.
8        Q    And before you were sort of released to
9  return to work with your doctor?
10       A    Yes.  He and I had also had that discussion
11 when I came in December to the company Christmas
12 party.
13       Q    Now, Mr. Klingensmith, he's the general
14 manager of the store, correct?
15       A    Yes.
16       Q    Nobody is higher than him other than Sandy
17 Cooperman at the store, correct?
18       A    When I left, I'm not sure if Laree was
19 actually considered higher-up than he.  I'm not sure
20 of the exact positioning there.
21       Q    In any event, Mr. Klingensmith is telling
22 you focus on your health, get better, and we'll talk
23 about it when you are ready to come back, correct?
24       A    Yes.

27

Stephanie Mraz - by Ms. Lloyd

1        Q    Did you talk to anybody else other than
2  Mr. Klingensmith and Ms. Holmes, anybody in management
3  about returning to work?
4        A    No.
5        Q    Now, when you talked to Ms. Holmes, did you
6  keep any notes, any diary, about your discussions?
7        A    No, I didn't think I needed to.
8        Q    If you could -- I'm going to from time to
9  time show you your interrogatories.  So if you can
10 keep them in front you and turn to interrogatory
11 No. 13.
12       A    Okay.
13       Q    Now, my first question is this:  When you
14 were looking to return to work, did you want to return
15 40 hours a week, full time, at the end of May of 2003?
16       A    Full time was never brought up by anyone.
17       Q    That wasn't my question.  Did you want to
18 return to work 40 hours a week, full time?
19       A    That's a hard one to answer.  With
20 everything that I had gone through, my treatments, the
21 stress -- mentally yes, physically no.
22       Q    So if you look at your response to
23 interrogatory No. 13, it asks about the schedule you
24 requested.  And if you look at your response, it says

Stephanie Mraz - by Ms. Lloyd

1 initially the Plaintiff specifically requested to work
2 three or four mornings from approximately 8:30 to
3 12:30 p.m. to maximize her energy level while at work.
4 And then it talks about a weekend rotation.  I have
5 some questions about that.
6        You asked Mr. Tile -- and when I say
7 Mr. Tile, you asked Ms. Holmes, correct?
8        A    Yes.
9        Q    That you wanted three or four mornings, a
10 four-hour shift; is that correct?
11        A    That conversation was made after she
12 initially commented on the two days, four hours a
13 week.
14        I made up this.  Before we even discussed
15 anything, I had sat down and after Gary's initial
16 comment of don't worry about it, you know, worry, you
17 know, concentrate on getting better, I then had spoken
18 with Bev on the phone and we were discussing a few
19 things, and I said, you know, we were discussing
20 things.  And she had made a comment, you know, that's
21 too many.  Five days a week is too many days.  That's
22 too much.  You should start out slow.  You know, that
23 comment was made by her and Jody Klingensmith.
24        This -- when I sat down and worked this out,

Stephanie Mraz - by Ms. Lloyd

1 this was after Gary's response, and then Lois's
2 initial response of, you know, what about two days a
3 week, four hours a day.  And I said, you know, with
4 the weekend rotation, that's not fair to the other
5 girls.  They have worked for how many months the
6 weekend rotation.
7        So this was in my response to them initially
8 saying two days a week, four hours a day.
9        Q    Did you ever request to work full time, 40
10 hours a week, of anybody at Mr. Tile upon your return?
11        A    It was never mentioned by either of us.  It
12 never came up in conversation.
13        Q    So to answer my question, you did not
14 request to go back full time, 40 hours a week?
15        A    I never asked because it never came up
16 because I was responding to what they initially said
17 to me.
18        Q    Well, if they say, you know, Ms. Mraz, you
19 can come back two days, four hours a day, you could
20 have suggested, no, I'm ready to come back full time,
21 40 hours, correct?  But you never did that?
22        A    No, I did not.
23        Q    Now, the schedule you proposed of three or
24 four mornings, that would put you working maybe 12 to

---

30

Stephanie Mraz - by Ms. Lloyd

1 16 hours during the workweek Monday through Friday,
2 correct?
3        A    Yes.
4        Q    Now, I was a little confused about your
5 answer as to the weekends.  Were you proposing to work
6 every weekend also or just certain weekend rotations?
7 Could you explain that for me?
8        A    Yes.  We worked -- when I left the office on
9 my sick leave, we were working every fourth weekend,
10 and that was called our weekend rotation.
11        Q    And how long of a day did you put in on a
12 weekend rotation?
13        A    Our weekend rotation, just the weekend, was
14 Friday, noon to 9, Saturday, 9 to 5:30, and Sunday
15 noon to 5.
16        Q    And is that how you come up with the 18.5
17 hours?  The weekend rotation would be about that?
18        A    Correct.
19        Q    Now, what were you proposing to do when you
20 talked to Ms. Holmes when you were returning to work?
21 Were you proposing to work every weekend rotation or
22 how many?
23        A    No.  I was -- I offered to go back into the
24 weekend rotation.  When I left, it was every fourth

---

31

Stephanie Mraz - by Ms. Lloyd

1 weekend.  And I had stated to her, you know, that the
2 girls have filled in covering for my weekend rotation.
3 That's not fair to them.  You know, I would be more
4 than willing.  What could we work out during the week?
5 If I worked a weekend rotation, to work less through
6 the week because the weekend rotation is so many
7 hours.  And I did ask, you know, is that something we
8 could lessen the Saturday, because we worked 9 to 5:30
9 with no break and the Friday noon to 9, which I did
10 initially ask, you know, what could we do with that.
11        Her response to that was don't worry about
12 the weekend rotation.  How did she state that -- that
13 the girls have been filling in.  They don't really
14 mind -- was her response to me offering to fill in a
15 weekend rotation also.
16        Q    In response to her saying the girls don't
17 really mind, they can handle it, did you tell her, no,
18 I'm ready to work the weekend rotation?  I want to do
19 it.
20        A    I presented her with this, and she again
21 was, you know, that's when she really started in with,
22 you know, we've come up with two days a week, four
23 hours a day, to start you back and then to work into
24 more hours.

33

Stephanie Mraz - by Ms. Lloyd

1    Q    But I want to make sure I understand your
2 answer.  Did you tell her, I'm ready to work the
3 weekend?  I can do it.  Nobody needs to cover for me
4 anymore.  Physically, mentally, I can do it on the
5 weekends.  I want to do it.
6    A    That is what I was trying to get across to
7 her, and I was told no by her.
8    Q    Well, you were trying to get that across,
9 but did you say it as bluntly as I just put it?  I can
10 do it.  I can work Friday noon to 9.  I can work
11 Saturday, the long shift.  I can do it on Sunday.  I
12 can do it.
13    A    I didn't specifically say those hours.  I
14 was asking for, you know, to do the weekend.  What
15 could we work out to shorten a few of those hours
16 knowing noon to 9 would be too long and 9 to 5:30 on
17 Saturday would be long also.  And --
18    Q    At that -- I'm sorry, go ahead.
19    A    And she again said don't worry about it.
20 Don't worry about the weekends.  That's too much for
21 you.
22    Q    So when you were talking about doing the
23 weekend rotation, you weren't talking about doing full
24 shifts during the weekend?  Like the noon to 9 shift,

Stephanie Mraz - by Ms. Lloyd

1 you weren't going to do that nine-hour shift?
2    A    We talked about a couple of different
3 things.  So to the best of my recollection, I am not
4 sure if we were on the same page as to the exact hours
5 because, you know, I mentioned it.  And then she again
6 said don't worry about it.  You know, that's too much
7 for you.
8    Q    But were you capable of doing a nine-hour
9 shift at that time?
10    A    Physically, no, but I offered.
11    Q    But you offered to do something that you
12 couldn't have done?
13    A    Because I felt obligated and felt bad that
14 everyone had filled in while I was gone.  And until I
15 actually went into work and worked the four hours, I
16 guess I did not realize exactly how fatigued, you
17 know, how fatiguing that even four hours was.  It was
18 a lot.
19    Q    But to answer my question clearly -- I'm not
20 trying to put you on the spot, and maybe I am -- but
21 you were offering to do a shift that physically you
22 knew you couldn't do, a nine-hour shift, correct?
23    A    Yes, because that's the type of employee I
24 was.  I went to work whether I was sick or not.

34

Stephanie Mraz - by Ms. Lloyd

1    Q    And I appreciate that.  But Ms. Holmes and
2 you were having a dialogue as to what was going to
3 work and what might not work, correct?
4    A    Right.  It was -- to the best of my
5 recollection, I believe I mentioned it once, you know,
6 about pulling a weekend rotation, and she stated, you
7 know, don't worry about it.  And I said, well, you
8 know, I can work out regarding the
9 hours.  And she again, you know, it was stated again,
10 don't worry about it, don't worry about a weekend
11 rotation.  Let's just start you back in during the
12 week two days a week.
13    Q    Would you say she was receptive to getting
14 you back on the -- back working in some capacity?
15    A    To a point, yes.
16    Q    Now, when you started back in late May of
17 2003, I think May 27 or something like that, the first
18 couple of weeks when you were back, how were you
19 feeling?
20    A    To the best of my recollection, I was very
21 fatigued, even just the four hours.  It was very
22 fatiguing because I had spent the previous how many
23 months -- I napped during that time that they decided
24 I should work.  And it did, it took me several weeks

35

Stephanie Mraz - by Ms. Lloyd

1 to, you know, kind of get out of that, of being so
2 initially fatigued during that particular time.
3    Q    You were working a four-hour shift at that
4 period of time?
5    A    Could you explain.
6    Q    I mean, when you went back to work, it's my
7 understanding you were working two days, a four-hour
8 shift, approximately?
9    A    Correct.
10    Q    And the four-hour shift is the same amount
11 of time that you had proposed working to Ms. Holmes
12 Monday through Friday?
13    A    Yes.
14         MS. LLOYD:  I'm going to show you what we'll
15    mark as Exhibit 2.
16                        -  -  -
17         (Whereupon, Defendants' Deposition Exhibit
18    No. 2 was marked for identification.)
19                        -  -  -
20 BY MS. LLOYD:
21    Q    Before I ask you about that one, let me
22 clean up the record a little bit.
23         The Beverly that you had mentioned, Bev or
24 Beverly, what was her last name?

Stephanie Mraz - by Ms. Lloyd

1     A    Soloski.

2     Q    Just so when we read this some day, we'll

3  all be on the same page.

4         And when you returned to work, what days

5  were you working?  Did you have scheduled days?

6     A    They instructed me to work Tuesday and

7  Thursday 2 to 6.

8     Q    Now, you mentioned needing naps when you

9  went back to work.  That's not anything to be

10 embarrassed about.  I need them and I don't have the

11 diagnosis.  But you said that you do need -- did need

12 to nap at this period of time.

13        When were you taking regular naps?

14    A    I had napped daily through my treatments and

15 my recovery when my son did to get myself rest, and

16 that was between like 2 and 5 in the afternoon.  We

17 usually took a three- or four-hour nap.

18    Q    Was he living with you full time during the

19 time when you were returning back to work?

20    A    When we returned to the house at Meadow

21 Street?

22    Q    Yes.

23    A    Yes.

24    Q    Okay.  So like May of 2003 right before you

---

Stephanie Mraz - by Ms. Lloyd

1  returned to Mr. Tile, your son was living with you and

2  you sort of got into a habit of an afternoon nap?

3     A    Yes, ma'am.

4     Q    But did Lois Holmes tell you that they

5  didn't so much need you in the mornings as you

6  suggested, but needed you more in the afternoons to

7  work?

8     A    I believe that is how she stated it, yes.

9     Q    And you agreed to do that even though

10 ideally you would have preferred to work in the

11 morning; is that fair?

12    A    My understanding was it wasn't a choice.  I

13 was to work that or basically preferably not work at

14 all.

15    Q    Well, she did tell you that you weren't

16 really needed in the morning at that period of time,

17 correct?

18    A    There's always people needed in the office.

19    Q    But did she tell you that you weren't needed

20 to work in the morning at that period of time?

21    A    That is what she stated, yes.

22    Q    Now, getting back to the exhibit I marked,

23 Exhibit 2, I understand this is not something you

24 prepared?

---

Stephanie Mraz - by Ms. Lloyd

1     A    Correct.

2     Q    But it is the time sheet summary of your pay

3  periods through the various weeks from the time you

4  returned to the time that you were terminated.  And so

5  I want to ask you about that.

6         And I understand you might not know exactly

7  how many hours you worked in any given week, but I'm

8  going to start with the first pay period ending there

9  at the very last week of May.

10        Does it sound about right that you would

11 have put in around 8.33 hours your very first week of

12 work?

13    A    That sounds about correct.

14    Q    Consistent with what they were telling you,

15 two, four-hour shifts, the first couple of weeks back

16 you were working just a little bit over eight hours?

17    A    And in response to being a little bit over,

18 at the 6 o'clock hour, that is usually when the truck

19 drivers came in and you were getting money back from

20 them and doing general office duties.  If the other

21 girl -- there would have been another employee in the

22 office.  If she was busy taking a credit application,

23 even though I was there to do service work, I was

24 expected to do the other office duties.

---

Stephanie Mraz - by Ms. Lloyd

1         So if the drivers were coming back in, of

2  course that had to be attended to, or I may have been

3  filling out financial applications, what have you.

4     Q    Did Dr. Delgado release you to return to

5  work full time?

6     A    My understanding is that it was never --

7  nothing was ever specific or specified as to full

8  time, what have you.

9     Q    I know we have been having a little trouble

10 getting the exact records from Dr. Delgado on this.

11 But just from your conversations with him, do you

12 remember him ever saying you should work this many

13 hours or this many would be too many?

14    A    I do, and it is within here somewhere.  He

15 did at one point -- when I expressed my concern

16 regarding my extreme fatigue, he did at one point

17 recommend that I return to -- I believe he said

18 reduced hours or a less stressful job.

19    Q    Do you know when that was?

20    A    It would have been at one of my last visits

21 before returning to Mr. Tile.  I do not remember the

22 exact date.

23    Q    So this would have been during your leave of

24 absence from Mr. Tile before you returned that he

Stephanie Mraz - by Ms. Lloyd

1 suggested reduced hours or maybe a less stressful job?
2      A    Yes.  I believe he said reduced hours.  It
3 was a general conversation.  But he did at one point
4 express that, you know, maybe I could return to a --
5 it is written in here what he did tell me.
6      Q    Do you have that?  I don't know what
7 document specifically you are referring to.
8      A    Yes, I do.  Is that something -- I found it
9 last night when I was going through some stuff.
10           Do you remember where that might be?
11           MS. SUTTON:  Are you talking about
12      Dr. Delgado -- oh, in your response to
13      interrogatories.
14           THE WITNESS:  That would be -- sorry.
15 BY MS. LLOYD:
16      Q    Before we spend a lot of time looking, is
17 this something you wrote that you are looking for or
18 something that the doctor -- like a doctor's actual
19 note?
20      A    It's something we wrote in response to a
21 question.
22      Q    Then I have that.  I was thinking that
23 maybe --
24      A    I do believe so -- I'm sorry.

Stephanie Mraz - by Ms. Lloyd

1      Q    I have seen that.  I was thinking maybe
2 there was a medical note that I didn't read.
3      A    I believe it would then be in his office
4 notes, which is what we are still trying to obtain.
5      Q    Did he ever discuss with you specifically
6 how many hours he thought would be appropriate?
7      A    No, he did not.
8      Q    Dr. Delgado treated you for the cancer,
9 correct?  He wasn't your family doctor, correct?
10      A    Correct.
11      Q    Do you still see him up until the present
12 time?
13      A    Yes, I'm on a six-month checkup.
14      Q    Did you ever go to try and find some other
15 type of work following that one alternative of his two
16 suggestions?
17      A    No.  You do mean other than Mr. Tile to
18 work?
19      Q    Right.
20      A    No, I did not.
21      Q    And I'm talking about that specific time
22 frame before you returned with Mr. Tile?
23      A    No, I did not.
24      Q    Now, looking again at Exhibit 2, it looks

Stephanie Mraz - by Ms. Lloyd

1 like you were back for about four weeks doing eight
2 hours a week, and then for the pay period ending June
3 28, the last week of June, you worked some extra hours
4 that week.
5      A    Yes.
6      Q    And is it your recollection the 23 hours
7 approximately might have been what you put in that
8 week?  Does that sound about right?
9      A    That does sound right, and that was
10 during -- the reason I worked extra, I was told to
11 work extra because that was our annual inventory and I
12 was not given a choice in that matter.
13      Q    Who told you that?
14      A    Management.
15      Q    Who?
16      A    I do believe that was Lois per GK, per Gary
17 Klingensmith.  I'm sorry, I refer to Gary Klingensmith
18 a lot of times as GK.  That's how we refer to him.  So
19 I do apologize if I do that.
20      Q    That's okay.  We'll now know for anybody
21 that reads this what you mean.
22           So that was the inventory week?
23      A    Correct.
24      Q    How often does inventory get done?

Stephanie Mraz - by Ms. Lloyd

1      A    Once a year.
2      Q    And you think or you know it was Lois that
3 told you you had to work some extra hours?
4      A    To the best of my recollection, that
5 schedule would have been done by Lois.
6      Q    Now, did you work extra during the week
7 Monday through Friday or did you work some on the
8 weekend that particular week?
9      A    I do believe that was on a weekend.  I do --
10      Q    Go ahead if you weren't finished.
11      A    I do believe it was like Friday-Saturday,
12 but again we have the pay stubs and my time cards to
13 verify that.
14      Q    Now, when you initially were coming back to
15 work, we've already discussed you wanted to work one
16 weekend's rotation and Ms. Holmes said maybe she
17 didn't think that was such a great idea, correct?
18      A    To the best of my recollection, yes.
19      Q    Then do you have some criticism of her on
20 this particular weekend when they are doing their
21 annual inventory asking you to work some additional
22 hours that week?
23      A    My initial -- it was okay to work additional
24 hours only when it suited them.

Stephanie Mraz - by Ms. Lloyd

45

1  Q    But what I'm trying to figure out is given
2  that you had told them you were going to work a
3  weekend rotation, and through the discussions, that
4  wasn't what they had offered at that time.  They tell
5  you they need you this particular weekend for an
6  annual inventory.  Why was that a problem for you?
7  A    I never said it was a problem for me.
8  Q    Do you think it was discriminatory in some
9  way for them to ask you to work additional hours that
10 particular weekend?
11 A    I'm not sure I understand your question.
12 Q    I'm trying to sort out what you think the
13 discrimination is based on.  Do you think they were
14 treating you differently in some way by the fact that
15 they asked you to work inventory that weekend?
16 A    I'm not sure --
17 MS. SUTTON:  Well, just what pops into your
18 head.
19 BY MS. LLOYD:
20 Q    If you are not sure, that's a fine answer.
21 A    Okay.
22 Q    I only want what you know or don't know.
23 And if you don't know, tell me you don't know.
24 A    I would say, you know, that I don't know.

---

Stephanie Mraz - by Ms. Lloyd

1  I'm not sure of that.
2  Q    Were most of the employees of Mr. Tile asked
3  to put in a few extra hours during the annual
4  inventory?
5  A    Yes, it was always mandatory that you work
6  the inventory week, you know, the time during the
7  inventory.
8  Q    So you were treated the same as any other
9  employee during that week in that you were asked to
10 put in some additional time?
11 A    To my knowledge, yes.
12 Q    And following that particular annual event,
13 you went back to your pretty much an eight- to
14 nine-hour schedule for a while, correct?
15 A    Correct.
16 Q    Then coming along to August, the beginning
17 of August or the last week of July, it looks like
18 there are a couple of weeks there that you worked
19 again some additional hours; is that correct?
20 A    To the best of my recollection, yes.
21 Q    If your recollection is different than this
22 document, let me know I thought this might be helpful
23 to sort of tie in the dates here.
24 A    Again, these through -- 7-5 through 7-26

---

Stephanie Mraz - by Ms. Lloyd

46

1  would again, to my knowledge, be, you know, filling in
2  if the office got busy before I left.
3  MS. SUTTON:  Excuse me.  I don't think
4  that's the question that she is asking you at
5  this point.
6  BY MS. LLOYD:
7  Q    I think my question was roughly, is this
8  basically your memory that for these couple of weeks
9  you put in some additional hours?  That's what I
10 recall asking anyways.
11 A    I would have to look at the time cards.
12 Q    Do you have an independent recollection that
13 at some point in late July, early August, you put in
14 some additional time when an employee was on a leave
15 of absence?
16 A    Yes.
17 Q    Was that employee Bev Soloski?
18 A    Yes.
19 Q    Did you volunteer to work some additional
20 hours during that period of time?
21 A    To the best of my knowledge, I did mention
22 to Lois if they needed me, you know, because I knew
23 the work couldn't sit there.
24 Q    So you mentioned to Lois, if they need you,

---

Stephanie Mraz - by Ms. Lloyd

47

1  you could put in a few extra hours, correct?
2  A    You know, it was -- I'm not sure if I made
3  the initial, you know, the initial request, the
4  initial statement or if it was in response to
5  something she had said.
6  Q    In any event, this wasn't imposed upon you
7  as a mandatory thing like the inventory a couple of
8  weeks earlier?
9  A    To the best of my knowledge, I don't know if
10 they would have specifically asked me to fill in more
11 hours or if Lois would have taken it upon herself to
12 do so.  To my knowledge, I don't remember.
13 Q    But what you do remember is that you sort of
14 volunteered, if you need me, I'll work some extra
15 hours; is that right?
16 A    At one point, yes.
17 Q    And did Lois then give you some additional
18 hours during that period of time where the employee
19 was off?
20 A    Yes.
21 Q    How did that work out with you physically?
22 A    Physically, by the time Bev got back, I was
23 exhausted, to the best of my knowledge.  It was very
24 draining.  It was very tiresome.

49

Stephanie Mraz - by Ms. Lloyd

1    Q    Did you tell anybody in management, Lois or
2 anybody, how exhausting it had been for you?
3    A    To my knowledge, I believe it was mentioned.
4 Specifically to whom or exactly, I'm not sure.
5    Q    Well, that's what I want to find out, the
6 specifics.  If you think it was mentioned, who did you
7 mention it to that it was very demanding on you to
8 work those extra hours?
9    A    If I -- it would have been to Lois.
10   Q    I'm a little concerned about your answer.
11 Not would have been.  Did you tell Lois that it was
12 physically demanding or do you have no recollection of
13 doing that?
14   A    I don't recall at this time.
15   Q    Do you have a specific recollection of
16 telling anybody how physically demanding it was to
17 work those couple, at least -- not a couple -- let me
18 rephrase that.  I'm just going to wipe that question
19 clean.
20        Do you a specific recollection of telling
21 anyone in management at Mr. Tile that it was very
22 physically demanding on you to work extra time those
23 couple of weeks?
24   A    I don't recall specifically.

---

Stephanie Mraz - by Ms. Lloyd

1    Q    Now, getting into the end of August and
2 September, were you pretty much back to an eight- to
3 nine-hour week?
4    A    As far as I remember again without looking
5 at the time cards -- you know, anybody could print
6 this up.  So, I mean, without looking at the time
7 cards, that's what I recall after she came back from
8 sick leave.  No one instructed me to keep working more
9 hours.
10   Q    You were pretty much back to your old
11 schedule?
12   A    Right.
13   Q    At what point in time did you start asking
14 for additional hours?
15   A    I don't recall specifically when.  It was --
16 I don't recall specifically.
17   Q    Well, do you know what month it was?
18   A    It was, to the best of my knowledge,
19 September sometime, to the best of my knowledge.
20   Q    Who did you approach?
21   A    To the best of my knowledge, I approached
22 Lois first regarding more hours.
23   Q    And what do you remember about that
24 discussion?

---

50

Stephanie Mraz - by Ms. Lloyd

1        MS. SUTTON:  Do you recall?
2        THE WITNESS:  We had several conversations.
3    So I'm not sure at which times certain things
4    were said.
5 BY MS. LLOYD:
6    Q    I'm asking about the very first one.  Do you
7 remember what was said or what you specifically asked
8 for?
9    A    To the best of my recollection, I stated to
10 Lois that I was starting to feel stronger.  And work
11 was backing up.  Things were not getting done.  Would
12 I be allowed to work more hours.
13   Q    And what did she say to you?
14   A    She would check with Gary.  And nobody ever
15 answered me.
16   Q    And that conversation happened somewhere in
17 the neighborhood of September of 2003?
18   A    To the best of my recollection, yes.
19   Q    Did you ask her specifically for a specific
20 number of hours that you wanted to work in addition to
21 what you were already doing?
22   A    I believe I initially requested between 16
23 and 20 hours.  That was -- I'm not sure if that was
24 the initial request or subsequently after.

---

51

Stephanie Mraz - by Ms. Lloyd

1    Q    There was a series of discussions it sounds
2 like?
3    A    To the best of my knowledge, there were one
4 or two when I asked.  I never received a response from
5 anyone in management.
6    Q    Let me tease this out a little so I
7 understand.  You had one or two conversations with
8 Ms. Holmes only?
9    A    Yes.
10   Q    She was in management at that time, correct?
11   A    Yes, she was my office manager.  At that
12 time that was my understanding that she was my office
13 manager.  I was to go to her regarding situations.
14   Q    And what you requested of her is that you
15 wanted some extra hours, maybe as many as 16 to 20
16 hours?
17   A    To the best of my knowledge, yes.
18   Q    Just so I understand, had something
19 significant improved about your health since the time
20 in August and late July where you were working some
21 extra hours and just felt it was too physically
22 demanding?
23   A    It was just a gradual -- I wasn't a hundred
24 percent.  But the work was piling up, and it was not

53

Stephanie Mraz - by Ms. Lloyd

1 being attended to while I was gone, and the work that
2 needed to be done could not be done in eight hours a
3 week.  I worked there for five and a half years.  When
4 work needed done, I couldn't just leave it sit there.
5       So I know I was not a hundred percent, but
6 work needed done.  That took maybe precedence in my
7 mind.
8       Q    Well, were you asking to work additional
9 hours because you really physically felt you were
10 ready to do it or because you were trying to help out
11 Mr. Tile and get work done?
12      A    I'm not sure how to respond to that.  My
13 initial, you know, I was not a hundred percent, but I
14 was starting to feel somewhat better and work needed
15 done.
16      Q    So it was a combination?
17      A    It was a combination, yes.
18           MS. SUTTON:  I apologize, but I need to take
19      a break.
20           (A short recess was taken.)
21 BY MS. LLOYD:
22      Q    Before our short break, we were talking
23 about your requesting at some point around the
24 September time frame of 2003 for additional hours.

53

Stephanie Mraz - by Ms. Lloyd

1       Did Ms. Holmes ever tell you that your work
2 was backing up?
3       A    No.
4       Q    Did anybody ever, did anybody in management
5 criticize you that your work was backing up?
6       A    No.
7       Q    Did anyone ever express a concern that your
8 work was backing up?
9       A    To my knowledge, no.
10      Q    Did you tell Ms. Holmes that you thought you
11 were getting behind in your work?
12      A    Yes.
13      Q    And what was her response to that?
14      A    At one point Lois responding to me that when
15 I did finally get an answer from her -- I'm not sure
16 what the exact date was -- that they were not letting
17 me work any more hours because the office was slow.
18 And I believe at that point in the conversation I told
19 her, you know, things were backing up, and that
20 numerous things needed to be done.
21      Q    So it was only after she told no, you can't
22 have any more hours, we're slow, that you told her, I
23 feel my work is backing up?
24      A    Correct.

54

Stephanie Mraz - by Ms. Lloyd

1       Q    Prior to that, you never told her you were
2 getting backed up; is that correct?
3       A    No.  I believe it was mentioned.
4       Q    To whom?
5       A    To Lois.
6       Q    And what did you say?
7       A    That, you know, I'm asking for more hours
8 because things are backing up.
9       Q    Previously you told me that they never
10 responded to your request for additional hours.  They
11 actually did.  They just denied your request for
12 additional hours?
13      A    No.
14      Q    Okay, correct my impression.
15      A    The initial, if memory serves, and I think I
16 got ahead of myself in your previous question.  So I
17 do apologize.
18           The initial conversation was, you know, it
19 did take -- I'm not sure of exactly the date -- it did
20 take a lengthy time to get the initial response of no,
21 the office work is slow, you don't need to work any
22 more hours.  Then at that point, you know, I explained
23 work is backing up, this, that and the other thing,
24 and then again asked for more hours upon the second or

55

Stephanie Mraz - by Ms. Lloyd

1 third request.  No one answered me after that, after I
2 explained these are things that are not getting done,
3 it's backing up.
4       So I apologize for kind of leaping forward.
5       Q    That's okay.  I think I understand.
6       You requested some additional hours.  She
7 said no.  We're kind of slow.  You said, yes, but my
8 work is getting backed up.  And they said, no, we
9 still aren't going to grant your request.  And at some
10 point it wasn't discussed by them any further.
11      Is that a fair summarization?
12      A    The first part of that was correct.  The
13 second part when I explained the work was backing up
14 and then asked again for more hours, again I'm not
15 sure exactly how many times I asked.  I never received
16 a final response.
17      Gary went to market, and he wouldn't answer,
18 you know, nobody would give me a definite response
19 after that.  You know, work is backing up.  There are
20 things sitting here that need to be done.
21      Q    And that was your words as far as work
22 backing up, things need to be done?  That's what you
23 were saying, correct?
24      A    Yes.  And then Mr. Tile at one point admits

Stephanie Mraz - by Ms. Lloyd

1 to finding paperwork on my desk.  That was their
2 reason I was fired was for poor performance.  And
3 their last response was that things were sitting there
4 that should have been taken care of and return
5 authorizations sent back to the factory, credit memos
6 attached, what have you, that weren't being done.  And
7 that was their response.  So that's why I was fired
8 for poor performance.
9       Q    When Ms. Holmes -- well, first off, did you
10 have any discussions about wanting additional hours
11 with anyone other than Ms. Holmes?
12      A    I may have mentioned it once to Gary
13 Klingensmith.  I don't recall for sure.  I'm not sure.
14      Q    You wouldn't be able to tell me when or the
15 specifics?
16      A    No, I did not keep a journal nor notes.
17           MS. LLOYD:  Let me show you what we'll mark
18      as Exhibit 3.
19                        - - -
20           (Whereupon, Defendants' Deposition Exhibit
21      No. 3 was marked for identification.)
22                        - - -
23 BY MS. LLOYD:
24      Q    Now, is Exhibit 3 some type of note or

---

Stephanie Mraz - by Ms. Lloyd

1 letter that you wrote yourself?
2      A    I wrote this, yes.
3      Q    Did you give it to anyone?
4      A    I believe, if memory serves, Lois Holmes
5 came in and saw this and took it.  If I remember
6 correctly, I believe I was going to give it to Gary.
7      Q    This was --
8      A    After several requests, you know, in
9 response to the previous question of not getting an
10 answer regarding more hours.
11      Q    Why were you writing this?
12      A    Because no one would give me a response.
13 And I thought it was very unprofessional that they
14 would not answer me when all of this work was sitting
15 here that needed to be done and no one could give me
16 an answer.
17      Q    Were you thinking about suing Mr. Tile as
18 early back as October 23?
19      A    No.
20      Q    Did you do this on a computer or how was
21 this done?
22      A    It was done on a computer, yes.
23      Q    Was this a Mr. Tile computer?
24      A    Yes.

---

58

Stephanie Mraz - by Ms. Lloyd

1      Q    Did you do any other notations such as this
2 on a Mr. Tile computer?
3      A    Could you be more specific -- at this time
4 period?
5      Q    Yes, anything relating to the lawsuit, did
6 you make any of your own notes or send E-mails to
7 anyone on a Mr. Tile computer?
8      A    No.
9      Q    Did you have E-mail at Mr. Tile?
10      A    There was E-mail there, yes.  Me
11 specifically, no.
12      Q    You didn't have one?
13      A    No.
14      Q    When Ms. Holmes told you that business was
15 slow, is this something that she told you more than
16 one occasion?
17      A    I do not recall how many times she told me.
18      Q    Well, when you first started talking to her
19 about more hours sometime around September, this
20 Exhibit 3 is later down the road.  Each time you had
21 asked, she had mentioned something about business
22 being slow; is that accurate?
23      A    I'm not sure how many times she mentioned
24 work being slow again.  To the best of my knowledge,

---

59

Stephanie Mraz - by Ms. Lloyd

1 it was in September, she mentioned that once.
2           This was in response to after them telling
3 her all of this work is sitting here.  I never
4 received a response.  This was in response to, you
5 know, never hearing back from anyone in management.
6      Q    Did Ms. Holmes give you any other reason for
7 why you weren't getting any additional hours other
8 than business is slow?
9      A    Not that I recall, no.
10      Q    Did anyone else in management ever give you
11 a reason as to why you didn't get any additional hours
12 other than Ms. Holmes's statement that business was
13 slow?
14      A    No.
15      Q    Did you disagree with Ms. Holmes in some
16 respects about her assessment of business?
17      A    In regards to my position and the work that
18 I had to do, yes.
19      Q    But what about the company as a whole, was
20 business slow?
21      A    I have no knowledge of that.  I only know
22 the paperwork that was sitting in front of me that
23 needed to be attended to.
24      Q    So is it fair to say you personally felt

61

Stephanie Mraz - by Ms. Lloyd

1 that your own work was getting backed up, but you
2 can't comment as to whether she was right about the
3 company overall being slow?
4     A     Her response to me was the office was slow,
5 meaning we in the office did all of the paperwork.
6 financing, ordering, services, what have you, which
7 within the office I did not see that.  I didn't see
8 anyone just sitting around twiddling their thumbs.
9 There was work.
10     Q     Well, what specifically makes you think that
11 she was wrong about the office being slow?  I mean,
12 people are not going to be, hopefully, just goofing
13 off while they are at work.  They are going to be
14 working.  But there can be times where it's busier
15 than other times.
16          What was your perception of the office at
17 that time?
18     A     Again only being there two days a week, four
19 hours a day, I was busy.
20     Q     What about the other office workers?
21     A     To my knowledge, I don't -- you know, I
22 don't recall looking around seeing if everyone was
23 busy.  I was focused on work.  To the best of my
24 knowledge, everyone within the office had work to do,

---

Stephanie Mraz - by Ms. Lloyd

1 I did not notice, you know, it being slow because I
2 was focused on my own work.
3     Q     But would it be fair to say given you were
4 focused on your own work and only there two days a
5 week, you don't know the extent to which the other
6 office workers were busy or slow during that time
7 period?
8     A     To the best of my knowledge, no.
9     Q     You don't know?
10     A     No, I don't know.
11     Q     Upon your return to work in May of -- late
12 May of 2003, did you consider yourself to be a
13 full-time or a part-time employee?
14     A     I still considered myself a full-time
15 employee.
16     Q     By what standard?
17     A     It was never stated otherwise.
18     Q     What do you consider to be a full-time
19 employment?
20     A     Normally, that is 40 hours a week.
21     Q     You were working eight our nine hours a
22 week?
23     A     Correct.
24     Q     On average.  So why did you consider

---

62

Stephanie Mraz - by Ms. Lloyd

1 yourself to be a full-time employee given that you
2 were only working eight to nine hours a week?
3     A     Because I was off on a medical leave for
4 cancer.  There is nothing within Mr. Tile stating, you
5 know, coming back from cancer, you know, recovering
6 from cancer, it was just never specified.
7          I'm not sure if I'm answering you correctly.
8     Q     Can we agree that eight or nine hours a week
9 is not full-time employment?
10     A     Correct.
11     Q     Did you need someone from Mr. Tile to
12 specifically spell that out to you that you were part
13 time working only eight to nine hours a week?
14     A     In regard to benefits and what not, yes,
15 because I came back from a medical leave, that was not
16 of my own choosing.
17     Q     Well, it wasn't at Mr. Tile's choosing?
18     A     Right.
19     Q     And let's just be clear.  Mr. Tile didn't
20 cause your cancer?
21     A     Right.
22     Q     And you certainly didn't cause it either?
23     A     Right.
24     Q     They are both blameless in that regard.  Can

---

63

Stephanie Mraz - by Ms. Lloyd

1 we agree on that?
2     A     Yes.
3     Q     Now, so you come back.  You come back with
4 part-time hours, correct?
5     A     Correct.
6     Q     Now, nobody specifically told you, hey,
7 eight to nine hours a week is part time.  But you
8 certainly understood eight to nine hours is part-time
9 hours, correct?
10     A     Correct, with the understanding that I would
11 gradually add more hours as I started feeling healthy.
12 And then during our company picnic, I was placed in
13 the full-time employee drawing which was for $500.
14     Q     Well, being in a company drawing doesn't
15 make you a full-time employee when you are working
16 eight to nine hours, does it?
17     A     Yes.  In regards to that situation at the
18 company picnic, it was very clearly stated you had to
19 be a full-time employee for a year in order to be in a
20 cash drawing for $500.
21     Q     Was that Mr. Tile just being nice to you to
22 put you in the drawing?
23     A     Mr. Cooperman had -- that had nothing to do
24 with him.

Stephanie Mraz - by Ms. Lloyd

65

Stephanie Mraz - by Ms. Lloyd

1  Q   Well, what manager did that have to do with
2 that?
3  A   I asked Gary Klingensmith, John McCann,
4 Travis McCann, which would be the general manager,
5 manager, assistant manager, all three of them stated
6 that I was still considered a full-time employee and
7 that I had not lost any of my benefits.  Why am I even
8 asking them when -- I do believe it was Lois and Marie
9 were telling me at the company picnic, I was not
10 allowed to be in that drawing.
11  Q   Gary Klingensmith, and who were the other
12 two that you mentioned that told you you were still a
13 full-time employee?
14  A   The two other managers, John McCann and
15 Travis McCann.
16  Q   Now, regardless of what they might have told
17 you about being a full-time employee or not, you were
18 working eight to nine hours a week during that period
19 of time?
20  A   Correct.
21  Q   You were earning no benefits during that
22 period of time, correct?
23  A   Correct.
24  Q   And Lois Holmes and Laree McKinley both told

1 you you are not a full-time employee.  You shouldn't
2 even be eligible for this drawing, correct?
3  A   Correct.
4  Q   So how did it end up that you were in the
5 drawing?
6  A   Three managers told me I was still
7 considered a full-time employee and that I had not
8 lost any status or benefits, which prior to that, it
9 had never crossed my mind that benefits were taken
10 away from me.  You know, it just never crossed my
11 mind.  I wasn't asking for benefits or vacation time,
12 you know, during that time period.
13  Q   Well, did you think maybe they were just
14 trying to be nice to you by allowing you to be
15 eligible for the full-time employee drawing?
16  A   No.  I believe they were serious then.
17  Q   You think they were making a definite
18 statement as to the terms of your employment by
19 entering you into a prize drawing?
20  A   I believe so, yes.
21  Q   Even though the two other managers were
22 saying the opposite?
23  A   My office manager and Laree McKinley at the
24 time, to my knowledge, was never considered my

66

Stephanie Mraz - by Ms. Lloyd

1 manager.
2  Q   You reported to Lois Holmes, didn't you?
3  A   Yes, she was my office manager.
4  Q   In what way other than being in a prize
5 drawing in the summer of 2003 did you consider
6 yourself to be a full-time employee?
7  A   I don't think I ever, you know, considered
8 that I was a full-time employee.  It was, you know,
9 starting back to work, you know, per their suggestion
10 and then to work in more hours.  And then when I
11 wanted to work more hours, it was then denied.
12  Q   Let's go back because I thought we had
13 already established -- you never requested to work 40
14 hours a week, full time, correct?
15  A   It was never requested by either of us, no.
16  Q   What other part-time employees, someone
17 who -- I'll define it for you -- somebody who is
18 working less than 30 hours a week, let's say, gets
19 full-time benefits such as health care and all of
20 those other things?
21  A   There were I believe two employees at
22 Mr. Tile at the time that were receiving that.
23  Q   Who were those?
24  A   I just -- she has blond hair.  I can see her

67

Stephanie Mraz - by Ms. Lloyd

1 face.  She was working on Mr. Tile's side.  She had
2 always been -- to my knowledge as it was told to me --
3 had always been a part-time employee and received
4 benefits.
5  Q   That's a woman?
6  A   Yes, and I believe there was a man also.
7 And I'm not sure -- I don't want to say for sure.
8 This was told to me by Jody Klingensmith.
9  Q   Now, you have listed two men, Jason Miller
10 and Travis McCann, as people that you thought maybe
11 got a better deal than you.
12  Do you know if either one of those were
13 full-time or part-time employees?
14  A   When they left or --
15  Q   When they returned.
16  A   I don't have that information.
17  Q   So how do you know that you were treated
18 differently than Jason Miller and Travis McCann when
19 you don't know whether they were full time or part
20 time?
21  A   This was told to me by Jody Klingensmith
22 that they had left, quit, and then were hired back
23 with no loss of status or benefits.  I believe they
24 were full time, but that I am not exactly sure of.

68
Stephanie Mraz - by Ms. Lloyd

1    Q    So even you believe that when they were
2  hired full time or -- I'm sorry -- when they were
3  hired back after their leave, they were hired back
4  full time?
5    A    I believe they were.  I'm not -- I don't
6  know for sure.
7    Q    And by my definition full time being at
8  least 30, hopefully 40 hours a week, you weren't in
9  the same category as these two individuals because you
10 were working eight to nine hours a week, correct?
11   A    Right.
12   Q    Now, this blond woman, you don't know her
13 first name or her last name who was supposed to be
14 working part time --
15   A    Romaine Foster -- I'm sorry to interrupt
16 you.
17   Q    No, when you remember something, I would
18 rather you tell me than save it for your lawyer and
19 tell me three weeks from now.
20        Romaine --
21   A    Foster.
22   Q    Is she still with Mr. Tile?
23   A    I do not know.
24   Q    Do you know any of the circumstances by

69
Stephanie Mraz - by Ms. Lloyd

1  which you think she was getting a full-time benefit?
2    A    I do not know.
3    Q    Do you know how many hours she was working?
4    A    I do believe it was under 40.
5    Q    Do you know how many?
6    A    Exactly, no.
7    Q    Do you know if she was working, say, over 30
8  hours a week?
9    A    I don't know.
10   Q    Is she the only one that you are aware of
11 that may have been a part-time employee who was
12 getting what we considered to be full-time benefits?
13   A    I believe there was one other person.  I do
14 not know.  I'm not for sure.
15   Q    Do you have any idea who that other person
16 is?
17   A    I believe it was -- someone told me Bill
18 Kessler.  But I'm not for sure.
19   Q    Anybody else?
20   A    No, not that I remember.
21   Q    And one of the men you mentioned was Travis
22 McCann.  He's actually in management, correct?
23   A    Yes.
24   Q    What was his position?

70
Stephanie Mraz - by Ms. Lloyd

1    A    Prior to leaving?
2    Q    When he came back from leave?
3    A    I don't know.
4    Q    What about Jason Miller, do you know what
5  position he had when he came back from leave?
6    A    To my knowledge, he was a warehouse
7  employee.
8    Q    What was your title or position when you
9  came back from leave?
10   A    I don't believe anybody specified.  It was
11 just --
12   Q    What did you call yourself when people would
13 say, hey, what do you do?  What do you do for
14 Mr. Tile?  What did you call yourself?
15   A    Is this again when I returned from my leave
16 or prior --
17   Q    Right, when you returned from your leave.
18   A    When I returned, I worked in the service
19 department.
20   Q    What did you do there when you returned?
21   A    I did -- and I'll explain this the best I
22 can.  I did Bev's job that she was doing before I
23 left.
24   Q    Bev was the one that went out on medical

71
Stephanie Mraz - by Ms. Lloyd

1  leave for a brief period of time, right?
2    A    Prior to me being sick.  And I'll try to
3  explain that.
4    Q    Okay.
5    A    Bev and I basically upon my return switched
6  positions.  She did what I was doing before I left,
7  and I was doing what she was doing before I left.
8    Q    Now, Beverly, did she return from medical
9  leave?
10   A    Is that the medical leave when I first came
11 back?
12   Q    Right.
13   A    Yes, she did.
14   Q    Did she go out again on medical leave, if
15 you know?
16   A    I believe that's in Mr. Tile's last response
17 that she had been off again.
18   Q    Well, I'm asking about your personal
19 knowledge.  Do you know one way or the other?
20   A    No.
21   Q    Have you ever worked 40 hours a week
22 anywhere since you were terminated from Mr. Tile?
23   A    No.
24   Q    Why not?

73

Stephanie Mraz - by Ms. Lloyd

1      A   I have no job reference.
2      Q   Have you applied to places to work full
3  time?
4      A   Yes.
5      Q   You have applied to work full time at
6  places?
7      A   I have applied.  I didn't finish those
8  applications because again I have no reference from an
9  employer for five and a half years.
10     Q   Let me ask you about Warren School District.
11         MS. LLOYD:  We'll make this Exhibit 4.
12                       - - -
13         (Whereupon, Defendants' Deposition Exhibit
14     No. 4 was marked for identification.)
15                       - - -
16  BY MS. LLOYD:
17     Q   Is this an application you filled out around
18  the end of July of 2005 for the Warren County School
19  District?
20     A   Yes.
21     Q   This is all your handwriting?
22     A   Yes.
23     Q   And at the top it says you are requesting
24  part-time employment.  Do you see where you checked

---

Stephanie Mraz - by Ms. Lloyd

1  the box there under part-time?
2      A   Yes, that is what was available at the time.
3      Q   Well, why if you could have checked any of
4  the boxes did you put down part time versus full time?
5      A   Because what I was applying for was only
6  part time.
7      Q   What positions specifically were you
8  applying for?
9      A   They had a couple -- as it says here --
10  secretarial teacher aides.
11         They needed -- my sister is a school teacher
12  within that district, and they called them T-aides.
13  And they sometimes had TSS support that you could
14  apply for, and those were -- they listed them as part
15  time with maybe potential to full time.  It depended
16  on what was listed on the board at the time.
17     Q   Why were you interested in part-time
18  employment versus seeking out something else that had
19  full-time employment?
20     A   It was just something I was trying to get
21  into because I was already there.  I was volunteering
22  to help my sister.  And I just thought it was .
23  something to -- if I'm already there, why not get paid
24  for it.

---

74

Stephanie Mraz - by Ms. Lloyd

1      Q   Have you sought out any full-time
2  employment -- I'm not asking whether you got hired or
3  considered -- have you sought out from any employer
4  full-time employment since leaving Mr. Tile?
5      A   No.
6      Q   Why not?
7      A   Again I have no job reference to finish an
8  application to inquire for any type of employment.
9      Q   Wouldn't that be the same whether you were
10  filling out an application for full time or part time?
11  You still don't have a reference?
12     A   Correct.
13     Q   So why fill out an application for part-time
14  employment and not seek full-time employment?
15     A   This, when I filled it out, this was part
16  time.  What was listed when I filled this out -- there
17  are sheets on a board within the grade school, and
18  they list them depending.  And you have apply for them
19  as they are listed on the board.
20     Q   I understand that.  This particular position
21  you said was part time.
22     A   Right.
23     Q   So naturally you applied for part time?
24     A   Right.

---

75

Stephanie Mraz - by Ms. Lloyd

1      Q   That doesn't explain my question which is
2  really a part of it more generally asking why have you
3  not tried any full-time employment?  If you are
4  concerned about your reference, you have got that same
5  concern whether you are applying for full time or part
6  time.
7      A   Right.
8      Q   So why not try full-time employment?
9      A   I just have not.
10     Q   Why not?
11     A   I'm working now for my aunt, and it's
12  soothing to me.  And I at this time am not interested
13  in being anywhere else at this particular time.
14     Q   Is your aunt associated with Slocum's?
15     A   Slocum's.
16     Q   I'm sorry.
17     A   Yes.
18         MS. LLOYD:  Let's mark this as Exhibit 5.
19                       - - -
20         (Whereupon, Defendants' Deposition Exhibit
21     No. 5 was marked for identification.)
22                       - - -
23  BY MS. LLOYD:
24     Q   This was something that was produced to me

81

Stephanie Mraz - by Ms. Lloyd

1    Q    So he's in -- what -- first grade?

2    A    Kindergarten.

3    Q    And you are pretty much the sole caretaker
4 of him with some of your family's help?

5    A    If needed at times.

6    Q    Did you while you were -- when you returned
7 to work at Mr. Tile and had some discussions with Lois
8 Holmes and even in the month before you actually
9 officially returned to work in 2003, were there some
10 discussions there about needing to work your schedule
11 around your son's schedule, his nap schedule?  Do you
12 remember some of that?

13    A    I believe that was her perception of what I
14 said.  I mean, I worked there for five and a half
15 years.  I wouldn't expect an employee to work around
16 my son's nap time.  It was mentioned in conversation
17 with my own needs for a nap initially coming back,
18 which we answered in one of your previous questions.
19 You know, that is the time frame that he and I both
20 laid down.

21    Q    If I understood you correctly, you wouldn't
22 expect Mr. Tile to work around your son's nap
23 schedule?

24    A    Yes.

---

Stephanie Mraz - by Ms. Lloyd

1    Q    Would that be also fair you wouldn't expect
2 Mr. Tile to need to schedule around your own nap
3 schedule?

4    A    In regards to this situation, it was a very
5 unusual circumstance.  There was no precedent within
6 the company to answer that.

7        So I'm not sure if I'm really answering your
8 question.

9    Q    Did you expect them to schedule your hours
10 around your nap schedule?

11    A    No.  It wasn't necessarily me asking them to
12 work around my nap time.  It was -- I was more awake
13 in the morning.  I wasn't as fatigued and tired.  And
14 I felt I could do a better job in the morning.  I was
15 fresher and more alert.  And I was not as extremely
16 fatigued as I would have been in the afternoon and
17 evening subsequently.

18        I mean, I wasn't -- I'm sure I mentioned,
19 you know, that is when I usually napped.  I believe
20 that was taken out of context.  It was within the
21 conversation of, you know, I believe I can do a better
22 job for you in the morning versus the afternoon
23 because I know I'm tired.  I just went through all of
24 these excruciating treatments.  I know when I'm tired.

---

82

Stephanie Mraz - by Ms. Lloyd

1 I know my body, it's been through a lot.

2    Q    Now, with respect to your present
3 employment, is it fair to say right now you are
4 content to work 20 hours a week and you are not trying
5 to look for more hours at this point in time?

6    A    At this time, no.

7    Q    Does that have anything to do with what you
8 claim happened to you at Mr. Tile or is that just
9 present life circumstance, 20 hours works best for
10 you?

11    A    At this time that's what works for me, yes.

12    Q    There are some other -- you can look at
13 these if you want -- interrogatory No. 2 lists some
14 other places that you might have worked, some before
15 you worked for Mr. Tile and some afterwards.  So I
16 would like to ask you about those.

17        It looks like you worked at the Rite Aid
18 store from December of 2003 to March of 2004; is that
19 accurate?

20    A    Yes.

21    Q    So was that the first job that you held
22 after being terminated from Mr. Tile?

23    A    Yes.

24    Q    Were you full time or part time?

---

83

Stephanie Mraz - by Ms. Lloyd

1    A    Part time.

2    Q    Was it a part-time position that you were
3 applying for or was it a full-time position that you
4 applied for?

5    A    As I recall, part time was the only thing
6 that was available.

7    Q    Why did your employment come to an end in
8 March of 2004?

9    A    I left my husband and left the area.

10    Q    During that period of time, what did you do
11 for the Rite Aid store?

12    A    I was cashier and did general work,
13 restocking the shelves, tagging things, what have you.

14    Q    Have you worked anywhere else other than
15 Slocum's and the Rite Aid store since your termination
16 from Mr. Tile?

17    A    No.

18    Q    Now, prior to Mr. Tile, you worked at the
19 Bel Aire Hotel for a period of time it looks like?

20    A    Yes.

21    Q    For about a year?

22    A    Yes.

23    Q    What did you do for the Bel Aire Hotel?

24    A    I was a hotel -- front reservations, front

Stephanie Mraz - by Ms. Lloyd

1  desk clerk.

2      Q    And you worked for Mr. John Backus for about
3  a year?

4      A    Yes.

5      Q    What did you do for him?

6      A    I was a nanny.

7      Q    Any other significant work experience -- and
8  by significant, I'm not talking about babysitting for
9  someone for a week or so.  Anything substantial?

10     A    Yes.  I worked for Compassionate Home Care
11 which is also another one of my aunt's businesses.  I
12 worked there for several years.  At one point I
13 actually worked three jobs.

14     Q    Has that been since your termination from
15 Mr. Tile?

16     A    No.  Prior to.

17     Q    Now, Howard Johnson Hotel, you worked there
18 as well?

19     A    Yes.

20     Q    Have you ever thought of going back to
21 Compassionate Home Care, your aunt's business, to work
22 there?

23     A    She has approached me about it.  At this
24 time it's not -- it's not something I could do at this

---

Stephanie Mraz - by Ms. Lloyd

1  time.

2      Q    Physically or mentally or why?  I guess I'll
3  just ask why not?

4      A    It's a very demanding thing to take care of
5  elderly people.  You have to be in the right frame of
6  mind to do that.  And her name says compassionate.
7  And not that I'm not compassionate.  But, you know,
8  dealing with, you know, subsequently leaving my
9  husband, there is lot of issues there.  It's just not
10 something I feel I could give 100 percent to.

11     Q    What were you earning with Compassionate
12 Home Care?

13     A    I believe it is stated here.

14     Q    If I'm reading this right, it says around
15 5.15 an hour?

16     A    Yes.  And that was several years ago.

17     Q    Was that full-time employment, 40 hours a
18 week?

19     A    When I worked for my aunt, yes.  I also
20 stayed on with my aunt, as you see, from '93 to '97.
21 With working at the Bel Aire Hotel, I was so -- you
22 know, I filled in when she needed me if a girl got
23 sick.  You know, she just kept me on her staff.

24     Q    Your aunt ran the hotel as well?

---

Stephanie Mraz - by Ms. Lloyd

1      A    No.

2      Q    I missed something.  Your aunt ran
3  Compassionate Home Care?

4      A    Yes.

5      Q    What else was she involved in?

6      A    Slocum's General Store.  So at one point
7  when I started working in '95 at Howard Johnson, I was
8  still working for Compassionate Home Care
9  simultaneously.

10     Q    Now, at Compassionate Home Care you were
11 working 40 hours a week, roughly?

12     A    Until 1995, yes.

13     Q    And your aunt has approached you about going
14 back to Compassionate Home Care in present times,
15 correct?

16     A    Yes, since I started working with her again
17 in 2004, yes.

18     Q    Has she suggested -- has it gotten so
19 detailed as to whether she suggested full-time
20 employment or to make up some hours where you are not
21 working at Slocum's?

22     A    No.

23     Q    And because of your divorce, you are not
24 interested in doing that right now?

---

Stephanie Mraz - by Ms. Lloyd

1      A    I'm separated, and at this time no.  I'm
2  content to work at the store.

3      Q    Does the fact that you are not going to go
4  back to Compassionate Home Care, potentially full-time
5  employment there, have anything to do with what
6  happened to you at Mr. Tile?

7      A    I think actually in a way, yes.

8      Q    In what way?

9      A    Due to the stress and co-workers'
10 management, you know, I believe in a way, yes.

11     Q    I don't really understand your response.
12 Please help me understand a little bit better.

13          Why when your aunt says you can maybe have a
14 potential to go back to full-time work with her at
15 Compassionate Home Care does that have anything to do
16 with what you think happened to you at Mr. Tile
17 several years ago now?

18     A    When you deal with cancer, it changes your
19 life and how you perceive things.  And stress is a
20 relative factor to dealing with cancer, surviving
21 cancer and I believe subsequently maintaining
22 cancer-free.  You know, to be staying cancer-free, I
23 do believe that stress had and does have a lot to do
24 with that.

Stephanie Mraz - by Ms. Lloyd

89

1    Q    So you are saying Mr. Tile wasn't the most
2  stress-free environment to work in while you worked
3  there?
4    A    It was a very stressful environment.
5    Q    Was that true even before your medical
6  leave?
7    A    Yes.
8    Q    So it was always stressful?
9    A    At times, yes.
10        MS. LLOYD:  I'm going to show you what we'll
11   mark as Deposition Exhibit 6.
12             - - -
13        (Whereupon, Defendants' Deposition Exhibit
14   No. 6 was marked for identification.)
15             - - -
16 BY MS. LLOYD:
17   Q    What I have put in front of you is
18 Deposition Exhibit 6.  I understand you did not
19 prepare this.  This is an employment record prepared
20 by Mr. Tile.  It was produced to your counsel.  I want
21 to ask you about the dates on here and just sort of
22 nail that down a little bit.
23        Is it accurate that you started with
24 Mr. Tile around January 19, 1998?

---

Stephanie Mraz - by Ms. Lloyd

1    A    Yes.  And when I started, I was actually
2  part time, and they listed me as a full-time employee.
3    Q    When you took your leave of absence, that
4  was started October 1, 2002?
5    A    Yes.
6    Q    When you started with Mr. Tile, did you get
7  any benefits?
8    A    In 1998?
9    Q    Yes.
10   A    Yes.
11   Q    What benefits did you receive?
12   A    To my recollection, it was the standard.  I
13 believe we had six sick days.  I'm not sure of the
14 time frame if it was a year or two years, you received
15 a two-week vacation.
16   Q    What about your health care coverage, was
17 that paid?
18   A    I never took advantage of the health care
19 through Mr. Tile.  I was always on my husband's
20 through his employer.
21   Q    At any point in time, you were never on the
22 health care?
23   A    Never.
24   Q    Do you know if when you started in January

---

90

Stephanie Mraz - by Ms. Lloyd

1  of 1998 as a part-time employee, was the health care
2  plan available to you, do you know?
3    A    I believe that it was.  I never asked
4  because I was on through my husband's insurance.
5    Q    So is it fair to say you don't know for
6  sure?
7    A    Correct.
8    Q    Your medical leave began 10-1 of 2002 we
9  established.  At that period of time you were earning
10 $9.50 an hour; is that accurate?
11   A    As I remember it, yes.
12   Q    And when you came back, you were earning
13 $9.63 an hour -- correct -- when you returned to work?
14   A    I believe so, yes.
15   Q    So you had actually received a raise during
16 the period of time that you were not working at all;
17 is that accurate?
18   A    It was my understanding they had initiated a
19 standardization of cost of living raises.
20   Q    You got a raise during the period of time
21 that you weren't working, correct?
22   A    Right.
23   Q    So in that way, you were treated the same as
24 any other employee who got their normal raises,

---

91

Stephanie Mraz - by Ms. Lloyd

1  correct?
2    A    I believe so, yes.
3    Q    Do you know why Mr. Tile permitted your
4  leave to extend eight months from October, 2002, to
5  the end of May, 2003?
6    A    Could you be more specific as to --
7    Q    Do you have any idea why they allowed that
8  to go on for that long period of time?
9    A    Why wouldn't they?
10   Q    I'm assuming you don't have fine knowledge
11 of the laws in terms of what is permitted and what is
12 required?
13   A    Right.
14   Q    Was there any discussion between you and any
15 of the managers about the period of leave being so
16 long?
17   A    No.  It was never an issue.  It was, you
18 know, repeatedly stated, don't worry about it,
19 concentrate on getting better, we'll figure it out
20 when you start coming back.
21   Q    So is it fair to say during that period of
22 time that you were off, a long period of time, nobody
23 ever suggested that your employment would be
24 terminated?

Stephanie Mraz - by Ms. Lloyd

1   A   No.  Gary Klingensmith himself -- I had at
2 one point raised that issue knowing the history of
3 Mr. Tile that when you are gone for a lengthy period
4 of time, they see fit to remove you.  And I expressed
5 that concern to him that I was worried about my job
6 security coming back, and he, you know -- and it is
7 within the documentation that he stated, don't worry
8 about it, just concentrate on getting better, your job
9 will be here waiting for you when you get back.
10   Q   So you knew it was at least a chance before
11 you had this conversation with Gary that when you are
12 out for a long period of time that you could be
13 terminated, correct?
14   A   They have done that to employees in the
15 past, yes.
16   Q   And in some sense, didn't they treat you
17 more favorably then that they kept your job open for
18 eight months?
19   A   I don't know if it was more favorably.
20 Dealing with cancer is not a normal leave of absence.
21 You know, there is no prior criteria for that.  I just
22 believe it was a daily -- it was a daily decision
23 every day.
24        I'm not sure if I'm understanding you

---

Stephanie Mraz - by Ms. Lloyd

1 correctly or not.
2   Q   If we eliminate the reason for the leave of
3 absence, there have been other people that have been
4 on a leave who have been terminated for being on
5 leave, whereas you were not?
6   A   I'm not sure if they were specifically on
7 leave of absences specifically situations regarding
8 that.
9   Q   Are there any restrictions on your ability
10 to work right now that any doctor has imposed?
11   A   That a doctor has imposed, no.
12   Q   Are you claiming any type of psychiatric or
13 counseling or any type of medical mental health
14 expenses as part of this action against Mr. Tile?
15   A   I believe, to the best of my knowledge, we
16 listed that as no.
17   Q   I want to make sure that is still accurate?
18   A   Yes.
19   Q   Where did you graduate high school?
20   A   Youngsville.
21   Q   When was that?
22   A   1990.
23   Q   And I saw from some response, you went to --
24 was it IUP for two years?

---

Stephanie Mraz - by Ms. Lloyd

1   A   Yes.
2   Q   And why did you quit?
3   A   I actually got sick with mono and went back
4 and tried to complete my courses which at the time it
5 would have been better for me just to drop those
6 classes and not try to take the finals.  I actually
7 did myself damage by doing that.  It hindered me in
8 pursuing the career I wanted to because I didn't pass
9 a required class.
10   Q   What career were you thinking of pursuing at
11 that time?
12   A   Hotel restaurant institutional management.
13   Q   Have you ever thought about going back to
14 school?
15   A   Yes.
16   Q   Do you have any plans to do so?
17   A   At this time, no.
18   Q   Have you gone to any other schools, trade
19 schools, vocational schools, anything like that?
20   A   No.
21   Q   Any present plans to do so?
22   A   No, not right now, no.
23   Q   Did you ever receive a written performance
24 evaluation at Mr. Tile?

---

Stephanie Mraz - by Ms. Lloyd

1   A   Never.
2   Q   Are you aware if they ever did any on
3 anybody?
4   A   From their own handbook, they state that
5 they are supposed to do so.
6   Q   To your knowledge, that wasn't actually
7 done, was it?
8   A   To my knowledge, I can't answer that.
9   Q   Did anyone ever sit down with you -- and
10 this is prior to your leave -- and go over your
11 performance in any kind of formal fashion?
12   A   No.
13   Q   Was your performance ever criticized prior
14 to your leave of absence?
15   A   Once.
16   Q   By whom?
17   A   Travis McCann.
18   Q   When was that?
19   A   In 2000 after Kathy Ranish quit and I took
20 over the service department, he mentioned briefly that
21 me coming in late to work, a few minutes late for
22 work, was noticed and that I needed to be aware of
23 that and not do that.  It was a general conversation.
24   Q   Any discipline?

96

Stephanie Mraz - by Ms. Lloyd

1    A    No.

2    Q    When you came back to work, when you
3 returned after your leave, did you sit down with
4 Ms. Holmes as part of your coming back to work and
5 have a discussion with her?

6    A    She called me into her office prior to me
7 starting work that day and had a conversation with me,
8 yes.

9    Q    Did she go over certain expectations about
10 your conduct at that time?

11   A    The conversation we had was not specifically
12 stated, Stephanie, these have been issues with you in
13 the past. What was stated to me was, I need to make
14 you aware of a few changes that Sandy, meaning
15 Mr. Cooperman, has made several changes within the
16 office. He will no longer tolerate, and she listed a
17 few things.

18        But it was not specified that these were
19 issues with me in the past. It was a general
20 conversation that it was an overall office change.

21   Q    What specific acts was he no longer going to
22 tolerate?

23   A    I believe she states in her paperwork that
24 swearing, tempers, talking, phone use, perfume.

97

Stephanie Mraz - by Ms. Lloyd

1    Q    I don't want to know what she stated in her
2 papers. I want to know what you recollect from your
3 meeting with Ms. Holmes. And if that helps refresh
4 your recollection --

5    A    Yes, it was along those lines. I believe
6 what she wrote was -- I don't remember specifically
7 about -- I'm sorry, I just lost my train of thought.
8 I apologize.

9    Q    That's okay. We were reviewing -- I know
10 you've looked at what Ms. Holmes put down in her notes
11 about what was reviewed.

12   A    Right.

13   Q    And you are in general agreement those
14 topics were generally discussed?

15   A    Right. They were not specifically noted
16 that they were a problem with me in the past and that
17 he would no longer tolerate that behavior from me
18 within his office.

19   Q    After that first conference -- I don't want
20 to call it a conference -- but discussion about what
21 wouldn't be tolerated, were you ever -- was your
22 performance or attitude or work criticized in any way
23 by anyone after that?

24   A    Once by Mr. Cooperman when he came out in

98

Stephanie Mraz - by Ms. Lloyd

1 the office and yelled at me in front of the other
2 employees.

3    Q    Tell me when and what he did.

4    A    This was October 23rd, I believe it was
5 around that date, but I believe it was actually the
6 23rd when he did that. That is in my handwritten
7 notes that I initially wrote and that you have. I
8 believe you were then given copies of.

9        It was such a -- it was a very bizarre
10 conversation. It made no sense whatsoever. He was
11 actually very incoherent. What he said to me, to the
12 best of my recollection, was to basically sit down,
13 shut my mouth and do my job, and that if I didn't want
14 to be there, I should just up and leave and quit.

15   Q    What specifically was he criticizing to
16 bring it to your attention?

17   A    I have no idea. We were at the time --
18 Rita, Beverly and myself were going over paperwork
19 that had been incorrectly attached to credit memos
20 that Lois was then to put into the computer and
21 deduct. We were trying to determine how these things
22 were being done incorrectly. And it was stated at one
23 point in that that I was the person doing these things
24 incorrectly.

99

Stephanie Mraz - by Ms. Lloyd

1        During this time, he came out and made that
2 statement when I stated to him -- after he said that,
3 I stated to him that, you know, it was not. I'm not
4 sure of the exact wording, but that, you know, why was
5 I being blamed for doing something that I did not do
6 and that I was trying to fix the situation. And he
7 came out and, basically, you know, screamed at me in
8 front of numerous employees.

9    Q    Who were the employees who witnessed it?

10   A    Beverly, Rita, I believe Jody Klingensmith
11 was there, and I'm not sure if the finance secretary
12 or the secretary was there. I do remember those four.

13       Prior to him doing that, nobody had said a
14 word to me as well as Lois's initial conversation with
15 me.

16   Q    Was that the same date you decided to then
17 file for unemployment compensation, October 23, 2003?

18   A    I believe so, yes. If it wasn't that exact
19 date, it was several days after that.

20   Q    Did he mention anything about the
21 unemployment compensation on that day?

22   A    On that day? On that day I had not filed
23 yet.

24   Q    So he was yelling at you before you even

100

Stephanie Mraz - by Ms. Lloyd

1 filed?

2    A    Yes.

3    Q    And there was no criticism of you, no
4 yelling, subsequent to your filing; is that correct?

5    A    Just that day, he came out and -- basically,
6 what he said made no sense.  It didn't really pertain
7 to anything.  It just -- it was a general rambling.

8    Q    He was unhappy?

9    A    Yes.  He was known for doing that.

10    Q    Who terminated you?

11    A    Lois Holmes called me on the phone and told
12 me my services were no longer required.

13    Q    Where were you at the time?

14    A    I was at home, Meadow Street.

15    Q    No, I'm not looking for that.  I was looking
16 at Exhibit 6.  It says that your last day of work was
17 November 16, 2003.  Does that sound right?

18    A    That's incorrect.

19    Q    I thought that seemed wrong.  What date was
20 it?

21    A    It was November 10.

22    Q    Okay.

23    A    I do believe that was maybe the end of the
24 pay period regarding that situation.

---

101

Stephanie Mraz - by Ms. Lloyd

1    Q    That's the last date you were paid.  You
2 were actually terminated a few days earlier than that.

3    A    I'm not sure what that date is that I was
4 terminated.  Lois called me November 10.

5    Q    So you were at home, you get a phone call
6 from Lois, and what does she tell you?

7    A    That my services were no longer required.

8    Q    Did she tell you anything else?

9    A    She at first told me that due to lack of
10 work that -- I do believe it was Sandy Cooperman
11 decided that I was no longer needed and that they
12 would distribute my job duties.

13    Q    Anything else in that conversation?

14    A    There was a lot in that conversation.

15    Q    How long did it last?

16    A    I don't recall.

17    Q    More than five minutes?

18    A    Yes.

19    Q    More than a half an hour?

20    A    I don't recall.

21    Q    What all do you remember?  You might not
22 remember the specific details, but whatever specifics
23 you can remember, please let me know.

24    A    I remember when she said I was fired for

---

102

Stephanie Mraz - by Ms. Lloyd

1 lack of work.  I questioned her on that and told her
2 that was a bunch of malarkey, that, you know, I had
3 enough paperwork to keep me busy for a long time, to
4 come up with something else.

5        It was not a pleasant conversation.

6    Q    How did she respond when you said that's a
7 bunch of malarkey?

8    A    I don't recall her exact response.  I did --
9 you know, this consideration I did write down after I
10 hung up the phone with her.  So that is in our notes.

11        MS. LLOYD:  Do you have that?

12        MS. SUTTON:  I'm wondering the same thing,
13    and I was wondering if from before -- I'm going
14    to go through the file with the client because I
15    don't recall having that.

16        THE WITNESS:  These are -- yeah, when I
17    first came to our initial meeting, I gave you --

18        MS. SUTTON:  As a matter of fact, I was
19    evening looking through the file before coming
20    here today to see if I had any additional notes
21    that I had shared with opposing counsel to make
22    sure that there wasn't anything that hadn't been
23    supplied through discovery.

24        I couldn't find it.  So I'm not sure if you

---

103

Stephanie Mraz - by Ms. Lloyd

1    are talking about something that either, A, you
2    think you gave to me and didn't, or B, something
3    unfortunately got brought into our office and
4    isn't in the file now which has happened on
5    occasions.

6        THE WITNESS:  It may be within the EEOC
7    claim paperwork.

8        MS. SUTTON:  It could be.  That's a very
9    good possibility.

10        THE WITNESS:  But I do remember I did write
11    this down after I hung up the phone with her.  It
12    was a very lengthy conversation.  I told her I
13    was not happy with the decision, that why was
14    I -- why was this not mentioned to me before
15    that, you know, after I said to her to come up
16    with another reason because I wasn't buying that
17    there was lack of work.  She said, well, your job
18    performance, you know.

19        And I don't recall her going into specifics,
20    but she said, you know, just that I was making
21    mistakes.  And I do believe she said that things
22    weren't getting done that needed to be done,
23    which, of course, is what I mentioned to her once
24    before, you know.

104

Stephanie Mraz - by Ms. Lloyd

1        I told her I didn't agree with her decision
2    and I wanted to speak with Gary.  And I do
3    believe I basically said if I didn't hear from
4    Gary Klingensmith, you know -- that I thought it
5    needed to come from him.  I'm not sure why I did
6    that, but I do remember saying that at some point
7    that I did want to speak with Gary regarding the
8    situation.
9  BY MS. LLOYD:
10     Q     Did you speak with Gary at some time?
11     A     No.  He would not speak to me.
12     Q     Did you ever speak to anybody else about it?
13     A     No.
14     Q     Now, given that she told you -- you had been
15 requesting additional hours and she told you at least
16 on more than one occasion that business was slow, why
17 didn't you believe that when she was saying that there
18 really wasn't enough work, your services aren't
19 needed, why didn't you believe that as being one of
20 the reasons for your termination?
21     A     Because I know the stack of paperwork that
22 was sitting at that desk that needed to be attended
23 to, and no one was taking care of it.  Beverly
24 started -- Bev on numerous occasions said that they

105

Stephanie Mraz - by Ms. Lloyd

1  need to give you more hours.  I can't do this by
2  myself.  You know, when are they going to give you
3  more hours.  I'm not doing this job when you're not
4  here because our job duties were separate.  She did
5  one end of it, and I did the other end of it.
6      Q     When did she make those comments?
7      A     I don't know the exact date.  It was --
8      Q     Just a month?
9      A     I would say around the time period around
10 September when I started asking for more hours.
11         MS. SUTTON:  Excuse me.  Can we go off the
12     record for one minute.
13         MS. LLOYD:  Sure.
14         (Discussion off the record.)
15 BY MS. LLOYD:
16     Q     So in your consideration, she mentioned that
17 business was slow again -- and I'm talking about the
18 phone conversation where you were terminated -- she
19 mention that?
20     A     Correct.
21     Q     She mentioned when you pressed her some job
22 performance issues and mistakes, things not getting
23 done.  This is what she said?
24     A     Correct.

106

Stephanie Mraz - by Ms. Lloyd

1      Q     I take it you didn't agree with her, but
2  this is what she was saying?
3      A     Correct.
4      Q     Were there any other grounds given for your
5  termination?
6      A     As I recall, no.  It was first of all, lack
7  of work.  Then I was a poor employee, and I wasn't
8  doing my job and, you know, those various things.
9      Q     How did you and Lois Holmes get along before
10 that?
11     A     I would say relatively well.
12     Q     Did your cancer or the treatment for your
13 cancer come up at all during your termination phone
14 call?
15     A     I don't recall.
16     Q     So you didn't bring it up, to your
17 recollection?
18     A     To my recollection, no, I don't recall.
19     Q     Why do you think you were terminated?
20     A     Because I had filed for unemployment and I
21 was told -- I was told by a couple of people within
22 the office that they would not take kindly to that and
23 that that would probably get me fired.
24     Q     Was that the only reason you thought that

107

Stephanie Mraz - by Ms. Lloyd

1  you were fired?
2      A     I believe it was a combination of several
3  things.
4      Q     What were all the things?
5      A     The general attitude towards me changed when
6  I won the money at the company picnic.  It started.
7  It's very difficult to explain.  I'm not sure why.
8      Q     Do your best because this is your shot.  I'm
9  trying to understand why you think you were fired.
10     A     I believe it was a combination of winning
11 the money, asking for more hours, trying to be a good
12 employee, do a good job.  You know, then filing for
13 the unemployment claim just kind of -- I really think,
14 you know, that was -- as it was told to me that, you
15 know, they would not take kindly to that.
16     Q     Who told you that?
17     A     Jody Klingensmith and Bev Soloski.
18     Q     And when did they tell you that?
19     A     Right before -- either right before I filed
20 or right after I filed.  I'm not sure.
21     Q     Was this the same day that Mr. Cooperman had
22 yelled at you?
23     A     I'm not sure if I filed exactly on the 23rd.
24 It is in the documents the exact date I did file.  But

108

Stephanie Mraz - by Ms. Lloyd

1 it was shortly thereafter.
2    Q    That's the date I have it.  It might be
3 wrong.  That's what I wrote down from the documents.
4    A    It's close.
5    Q    Okay.
6    A    It's within a couple of days.
7    Q    So presuming you filed around October 23,
8 2003, you received your notice that you were going to
9 get benefits within about five, six days; isn't that
10 right?
11    A    Correct.  And then those were suspended.
12 And I did not actually receive those because when I
13 was fired, when I told the unemployment compensation
14 that I was fired for lack of work, they said no,
15 that's not how that works.  You would have been laid
16 off if it was for lack of work.  And they asked me if
17 there was any chance of a recall that I would go back
18 there, and I said no.
19        So then at that point, at some point,
20 Mr. Tile did dispute the unemployment claim.
21    Q    When you initially filed, there wasn't a
22 hearing, was there?
23    A    No.  It was all -- I submitted the
24 application on line.

109

Stephanie Mraz - by Ms. Lloyd

1    Q    Didn't the unemployment representative
2 actually tell you that Mr. Tile was not disputing your
3 unemployment claim?
4    A    At first.  Then they did.
5    Q    Well, let me flush through this.  The
6 unemployment representative told you at first right
7 after you filed that Mr. Tile was not disputing your
8 unemployment claim, right?
9    A    I believe that is correct.
10    Q    So why do you think then that they
11 retaliated against you when initially when you filed
12 this and you have been told that they weren't
13 disputing anything?
14    A    But then they did dispute it.
15    Q    In what way did they dispute it?
16    A    I don't recall the exact specifics as to the
17 timetable when that occurred because when I called to
18 tell them that I was fired for lack of work, the
19 gentleman that I spoke with said that that's not --
20 I'm trying to think of his exact wording -- pardon
21 me -- that that's not normal and that they would not
22 have fired me for lack of work.  I would have been
23 laid off, to the best of my recollection.
24        I think maybe we're on a different -- I

110

Stephanie Mraz - by Ms. Lloyd

1 think I'm answering you.
2    Q    I don't understand the retaliation part.
3 Help me understand why you think that Mr. Tile
4 retaliated against you when you filed that claim.
5        Initially, it sounded like there was no
6 retaliation because they didn't contest it.  Are we in
7 agreement with that much so far?
8    A    Within the first two weeks of filing a
9 claim, there's -- it's like in limbo, was my
10 understanding.  So it's not that they were actually
11 disputing or not disputing.  That's my understanding.
12 It's when they are processing paperwork and what not.
13    Q    But the unemployment rep told you
14 specifically that Mr. Tile wasn't disputing anything
15 at that period of time -- correct -- when you
16 initially filed?  We just went through that I think.
17    A    I believe when I called that day to tell him
18 I was fired, that is when that conversation came up,
19 when he stated that.  I'm not --
20    Q    Well, you weren't fired until November.  So
21 is that when you think the retaliation started?
22    A    When -- my understanding of filing the
23 unemployment compensation was it took two weeks for
24 Mr. Tile to even get the paperwork, which would fall

111

Stephanie Mraz - by Ms. Lloyd

1 into the time period.  They received paperwork, my --
2 they received paperwork that Friday that I had filed
3 for unemployment.
4    Q    October 28, around that time period?
5    A    The Friday before -- I was fire on a Monday.
6 That Friday -- and it is in documentation -- they
7 received the paperwork that Friday.  I was fired that
8 following Monday.
9        So I'm not sure when this gentleman at the
10 unemployment stated that.  I believe it was when I
11 called to tell him I was fired, and he said -- I think
12 I'm confusing myself here.  I think I'm trying to
13 answer too much.
14    Q    Is the act of retaliation you are alleging
15 the fact that they fired you; is that it?
16    A    Could you be more specific?
17    Q    I'm sorry, I can't.  It's your claim.  What
18 is the retaliation?  What did they do to retaliate
19 against you?  You filed the claim.  What did they do
20 to you that you think is retaliatory?
21    A    They fired me the following Monday.
22    Q    Okay, that is the retaliation?
23    A    Yes.
24    Q    Is that the only act of retaliation that you

112

Stephanie Mraz - by Ms. Lloyd

1 are alleging or was there something else?

2    A    I believe that's it, to my recollection.

3    Q    Okay.  Now, according to your interrogatory

4 response No. 15, you stated -- and I assume when you

5 sat down to review these in writing, you were looking

6 at something with respect to the dates -- is that

7 accurate -- to piece this together?

8    A    I believe so.

9    Q    Now, you state in here, November 7, 2003,

10 according to the UC -- unemployment compensation --

11 representative:  Mr. Tile is not disputing anything.

12 That's what you wrote down in your response?

13    A    Correct.  And that would be they had just

14 received the paperwork.

15    Q    They had just received the paperwork on

16 November 7?

17    A    That would have been the Friday, and I was

18 fired on a Monday.

19    Q    Well, why would they fire you if they

20 weren't even bothering to dispute the unemployment

21 compensation, do you know?

22    A    My understanding is they pay for part of the

23 unemployment.  Their rates then go up.  So if they

24 actually have an employee file for unemployment, it

113

Stephanie Mraz - by Ms. Lloyd

1 increases their rates.

2    Q    Well, when you initially filed it, it was

3 because you had reduced hours, right?

4    A    Right.

5    Q    Did you then amend it at some point -- I

6 don't know if I'm using the technical words -- but did

7 you at some point later amend and state that now I

8 have been fired.  I'm entitled to more benefits?

9    A    I don't believe I called with the intention

10 of asking for more benefits.  It was -- my

11 understanding was that I had to call and report any

12 changes.

13    Q    Okay.  So you called and you reported the

14 change?

15    A    That they had fired me for lack of work.

16    Q    So it went from November 7, 2003, where

17 Mr. Tile was not disputing anything, at least

18 according to this man, to you think you were fired

19 several days later in retaliation for filing something

20 that they didn't dispute?

21    A    But they wouldn't have had actually time to

22 dispute anything is my understanding because they just

23 received the paperwork.  I think he was speaking that

24 for the first two weeks nothing was disputed, because

114

Stephanie Mraz - by Ms. Lloyd

1 I had filed the claim, and when he stated that,

2 Mr. Tile had done nothing.  They hadn't received the

3 paperwork.

4    Q    You had received the paperwork?

5    A    I had received the paperwork.

6    Q    Didn't Mr. Tile receive the paperwork at the

7 same time?  I don't know if you know, but --

8    A    My understanding was no.  The date that is

9 on the paperwork that they received was November 7.

10 So that's where this date comes from.

11         So I believe when this man told me that,

12 they had just received paperwork.  So, of course, they

13 weren't disputing it because they hadn't even looked

14 at it yet.

15    Q    Then why would he make the representation

16 that they weren't disputing anything if they never

17 even had a chance to look at it then?

18    A    I don't know.

19    Q    Did he explain that any further to you?

20    A    We then went into the conversation of why

21 would they fire me for lack of work.  I should have

22 been laid off.  And he at that point said he was

23 terminating the initial claim because I was saying one

24 thing, I was being, you know, let go for lack of work,

115

Stephanie Mraz - by Ms. Lloyd

1 and he said, well, that is not normal.  You know, you

2 can't be fired for lack of work.

3    Q    Did you mention that Lois had told you about

4 the performance issues as well?

5    A    Right.  I believe I did say then that, you

6 know, it went on to say that it was for poor

7 performance.  But initially, the conversation was I

8 was fired for lack of work.

9         So he at that point stated he was

10 terminating that while it was being investigated.

11    Q    So did you then tell him that the grounds

12 were, as relayed to you, for lack of work and

13 performances?  You told him that?

14    A    Yes.

15    Q    And in response he terminated your benefits

16 for a period of time?

17    A    They suspended them while they then

18 investigated, and I believe they called Mr. Tile and,

19 you know, got their side of the story.

20    Q    And were your benefits reinstated?

21    A    Yes, they were.  I believe it was another

22 two weeks.

23    Q    So in response to what you told the

24 unemployment hearing officer, your benefits were

116

Stephanie Mraz - by Ms. Lloyd

1 suspended, correct?

2     A     Pending an investigation.

3     Q     They investigated and spoke to Mr. Tile

4 after that, correct?

5     A     I believe so, yes.

6     Q     And after speaking to Mr. Tile, your

7 benefits were reinstated?

8     A     Because at that point then they were stating

9 that I was a poor employee.

10     Q     Well, they had stated that in the telephone

11 call terminating you, correct?

12     A     Not initially, no.

13     Q     Well, in the conversation you had with

14 Ms. Holmes, she said we don't need you.  Your services

15 are no longer required.  And then in the discussion,

16 it was talked about lack of work and also

17 performances, right?

18     A     Correct.

19     Q     Is there any physical reason presently why

20 you can't work full time?

21     A     I -- is that --

22     Q     Your own perception, not what a doctor --

23 you have already told me no doctors placed any

24 restrictions on you.

117

Stephanie Mraz - by Ms. Lloyd

1     A     Right.  My own perception, I mean, I do

2 still get fatigued, you know.  There are certain

3 things I struggle at doing.  You know, I'm not as

4 quick as I used to be.  So it is still an ongoing

5 process.

6     Q     Now, you have a whole heap of documents in

7 front of you.  What have you brought?  I don't know if

8 everything has been produced?  Is there some

9 additional notes that maybe you need to review with

10 your counsel and need to produce?

11         What is all that in front of you?

12     A     This is everything I've received from

13 counsel.

14     Q     Okay.

15         MS. SUTTON:  I believe all this is our

16     response to you, your response to us.

17         THE WITNESS:  This is Defendants' initial

18     disclosures.

19         MS. SUTTON:  I asked her to review certain

20     things.

21         THE WITNESS:  Which --

22 BY MS. LLOYD:

23     Q     I don't want anything that you and your

24 counsel have exchanged.  I just wanted to make sure

118

Stephanie Mraz - by Ms. Lloyd

1 there weren't additional notes that you had to produce

2 here today.

3         MS. SUTTON:  No.  The only thing that I

4     brought with me was the Delgado records that I

5     found.  But I will check into those other ones

6     that we discussed.

7 BY MS. LLOYD:

8     Q     Now, in interrogatory No. 24:  Have you kept

9 any original records or copies of any records that you

10 were required while employed with Mr. Tile?  And in

11 response, you said:  There were copies made of

12 services to discuss with GK, Gary Klingensmith, that's

13 regarding problems.

14         What do you have at home?  I wasn't clear

15 what this was.

16     A     That I believe was -- I have copies here --

17 they were -- I was in charge of the service department

18 and I had several issues with things being, you know,

19 not done correctly,  People not doing the work that I

20 needed them to do in order to get pieces of furniture

21 returned to the factory.  So I made these -- I mean,

22 Gary instructed me to make copies to conduct a meeting

23 with him.  He was a very busy man.  So by the time --

24 I never did get to conduct that Exhibit E on written

119

Stephanie Mraz - by Ms. Sutton

1 requests for production of documents response on

2 Exhibit E.

3     Q     Okay, I didn't know what those were.

4     A     Yes, those are the copies of stuff that I

5 had in my possession.  Those are things I had in my

6 possession at the time I was fired from Mr. Tile that

7 I did not know I had until I left my husband, and I

8 subsequently found this paperwork in a folder.

9     Q     And this all relates to information prior to

10 your leave of absence, it looks like?

11     A     Yes.  this is all stuff I was gathering to

12 conduct a meeting with Gary regarding numerous issues.

13         MS. LLOYD:  I would like about five minutes.

14     I may be about done.  So if you want to take a

15     break.

16         (A short recess was taken.)

17         MS. LLOYD:  I'm done.  That's all I have.

18                 - - -

19             EXAMINATION

20 BY MS. SUTTON:

21     Q     You were asked by Ms. Lloyd if you looked

22 for a less stressful job when Dr. Delgado said you

23 might want to work less hours or look for a less

24 stressful job.

120

Stephanie Mraz - by Ms. Sutton

1    At that time did you think that you needed
2 to find another job or did you believe that you had
3 every opportunity to end up at your regular full-time
4 position at Mr. Tile?
5    A    Correct, yes.
6    Q    Now, when you asked for additional work or
7 additional hours, and even at the time that you were
8 terminated because supposedly things were slow, were
9 there other people there working overtime?
10    A    Yes.
11    Q    How many?
12    A    Within the whole store or my immediate --
13    Q    In your immediate area.
14    A    Within the furniture office, there were two
15 or three.
16    Q    Two or three people working overtime.  So
17 they were working their 40 hours plus this additional
18 time?
19    A    Yes.
20    Q    And were they doing things that you could
21 have done?
22    A    Yes.
23    Q    Now, Ms. Lloyd asked you extensively about
24 why you would consider yourself a full-time employee

121

Stephanie Mraz - by Ms.  Sutton

1 when in fact you were only working eight or nine hours
2 a week.
3    Was it your understanding that you were
4 going to continue always working eight or nine hours a
5 week at Mr. Tile?
6    A    No.
7    Q    What did you think would ultimately happen?
8    A    That gradually my hours would be increased
9 back to full time.
10    Q    So was your belief that you were going to
11 again be working full time at Mr. Tile?
12    A    Yes.
13    Q    So even though you might not have been
14 accruing sick leave or vacation time while you were
15 working part time, did you think that the benefits
16 that you had accrued when you worked there -- what --
17 five and a half years, did you think that you would
18 retain those despite the leave of absence?
19    A    When I asked about benefits and what not, I
20 was referring to the time, vacation time, I would have
21 earned the previous year.  I worked nine full months
22 of the year full time as a full-time employee before I
23 got sick.  That is what I was asking about in regards
24 to benefits.  I wasn't concerned with the benefits of

122

Stephanie Mraz - by Ms. Sutton

1 that year.  You know, I was only working a few hours.
2 I wasn't asking for, okay, I'm back to work now.  I
3 want my two weeks' vacation.  I want my sick leave.  I
4 want my vacation time.  I wasn't asking about that.
5    I was asking for the subsequent year that I
6 had worked.  My understanding at Mr. Tile was you
7 worked the previous year for your benefits the
8 following year.
9    Q    Right.
10    A    So the benefits that I used the year I was
11 sick were from me working full time the year before.
12 I felt I was entitled to something for the nine full
13 months that I worked in regards to coming back to
14 work.  Then it wasn't -- I wasn't asking for, okay,
15 hey, I'm only here working eight or nine hours a week.
16 I want all my benefits.  I was referring to the
17 previous nine months of the previous year.
18    Q    Now, you worked full time at Mr. Tile after
19 you had your son?
20    A    Yes.
21    Q    You testified today that your in-laws who
22 also lived in Ford City --
23    A    Yes.
24    Q    -- watched your son while you worked; is

123

Stephanie Mraz - by Ms. Sutton

1 that correct?
2    A    Yes.
3    Q    So after you were terminated from Mr. Tile
4 and you and your husband subsequently separated, did
5 you have anybody to watch your son while you worked
6 full time?
7    A    No.
8    Q    And you had already testified earlier that
9 you believe that at least in part this termination by
10 Mr. Tile was responsible for your separation from your
11 husband; is that not true?
12    A    It contributed, yes.
13    Q    So you are not working full time now.  You
14 are a single mother as opposed to a woman from a
15 intact family, correct?
16    A    Correct.
17    Q    So your circumstances have dramatically
18 changed?
19    A    Yes.
20    Q    So if you worked full time at Compassionate
21 Care -- when you worked at Compassionate Care before
22 for your aunt and you worked there full time, did you
23 have a child?
24    A    No.

124

Stephanie Mraz - by Ms. Sutton

1    Q   If you would work there full time now, who
2 would watch your child?
3    A   I would have to pay a babysitter.  I do pay
4 one now a little bit.
5    Q   We were looking at Exhibit No. 6 that was
6 provided by Ms. Lloyd, and there from 1998 through
7 2003, it lists the rate of pay that you were earning
8 at Mr. Tile.
9       When you first started, you were getting $6
10 an hour.  And at the time you left, you were making
11 about $9.63 per hour.
12      So the fact that you received consistent
13 raises throughout this time would indicate that
14 apparently they were pleased with your performance; is
15 that correct?
16    A   Yes.  The actual -- and I made a note on
17 this here, the last -- I'm sorry I was mumbling.
18      When I was reviewing last night, something
19 caught my eye in regards to this, and I remembered
20 Gary Klingensmith -- I received a raise in January of
21 '02, 6 of '02.  On 6-24 of '02, they gave me a raise
22 knowing that they were doing a unilateral change
23 within their facility.  And that's how I subsequently
24 got the raise on 6-30.

---

125

Stephanie Mraz - by Ms. Sutton

1      Gary's comment on 6-24 was that I basically
2 did the service department by myself for two years and
3 I earned that raise.  And he basically apologized for
4 not giving me one sooner.  And he, you know, then I
5 subsequently got the unilateral raise also which, you
6 know.
7      When that happened, I felt like, you know,
8 you really didn't need to do that knowing that a
9 unilateral one was coming.  But I remembered him
10 saying, you know, saying that I had earned it, and I
11 basically ran the department by myself for two years.
12    Q   Now, also, during your testimony with
13 opposing counsel, you said that Mr. Cooperman had
14 yelled at you one day?
15    A   Yes.
16    Q   And that was the only time that you were
17 really aware of that you had been criticized.  And you
18 said this is one of his ramblings.  You said that he
19 frequently did these ramblings.
20      Could you explain what you meant by that?
21    A   Having worked in home health care in the
22 Compassionate Home Care, I was more aware of
23 Mr. Cooperman's sometimes senility.  If I mispronounce
24 that word, I apologize.  At times he had senile

---

126

Stephanie Mraz - by Ms. Sutton

1 moments that I was aware of with working with elderly
2 patients.  And at times he would come out and just say
3 things to various employees, and it was just
4 off-the-wall, made no sense.  And he was known for
5 doing this.
6    Q   Did you believe that the day that he yelled
7 at you that there was any basis for him yelling at
8 you?
9    A   From the little bit I understood of what he
10 said, I was shocked that I was being blamed for this
11 particular issue that we were working on.  I was
12 shocked that I was being blamed for it because it was
13 not something that I had done.  This was the
14 misperception of what he was being told by different
15 people.
16    Q   How did he become involved in that
17 conversation?  Was his office in close proximity?
18    A   Yes.  His office -- if we're sitting here
19 (indicating), his office was right there.  You know,
20 his door was always open.  He heard everything that
21 went on within the office to some extent.
22    Q   But what he did with you, he's done with
23 other employees?
24    A   Yes.

---

127

Stephanie Mraz - by Ms. Sutton

1    Q   Now, when Lois Holmes fired you over the
2 telephone, were you shocked?
3    A   Yes.
4    Q   Did you in any way, shape or form expect
5 that --
6    A   No.
7    Q   -- termination?
8    A   No.  Maybe in the back of my mind -- and I
9 do believe I made the comment to Lois that
10 Mr. Cooperman never liked me, and I figured it was
11 coming at some point because they had tried to get me
12 to quit after I returned from maternity leave.  I
13 think I kind of expected it.  But I don't think that I
14 ever expected that they would do it with, you know,
15 having worked there for five and a half years and
16 subsequently coming back from recovering from cancer.
17      Did that answer your --
18    Q   Yes.  Would you say that when you came back
19 to work and Ms. Holmes and Gary were telling you that
20 they only wanted you to work the number of hours that
21 they were having you work, that was their idea?  That
22 was not yours that you started?
23    A   To do the two days a week, four hours a day?
24    Q   Yes.

128

Stephanie Mraz - by Ms. Sutton

1    A    That was brought up by Lois, that she and
2 Gary had discussed it and that was their initial --
3 that was presented to me by them.  And I said, you
4 know, that's when we then -- and I explained that to
5 counsel -- that that's when I then came up with, you
6 know, presented the three days a week, four hours a
7 day.  And, you know, not thinking that the two days a
8 week, four hours a week -- excuse me -- two days, four
9 hours a week -- two days of four hours -- excuse me --
10 wasn't fair to anyone else.
11    Q    Okay.  But now did they at any time, did
12 anybody, Gary, Lois, anybody ever tell you that you
13 were always going to be a part-time employee from
14 thereafter at Mr. Tile?
15    A    The fact that I was a part-time employee was
16 never mentioned to me until my meeting with
17 Mr. Cooperman sometime around the date of this -- in
18 October when he stated that I was a part-time
19 employee, I had lost my employee status, I was a new
20 employee, and I had no benefits and I was low man on
21 the totem pole.
22    Q    But nobody in personnel or anybody from --
23    A    From May until October, nobody had ever
24 mentioned that to me.

129

Stephanie Mraz - by Ms. Lloyd

1         MS. SUTTON:  Okay, that's all that I have.
2         MS. LLOYD:  Just a couple of follow-ups.
3                    - - -
4                  EXAMINATION
5 BY MS. LLOYD:
6    Q    Has any filing for divorce been done yet?
7    A    No.
8    Q    Was a legal filing for separation done?
9    A    I'm not sure of the legality.  We did
10 have -- there were a few issues.  I'm not sure if that
11 was a legal motion or not.  I'm not aware of that.
12    Q    I understand you don't understand the
13 legality.
14    A    Exactly.
15    Q    But there is something formal.  There is a
16 legal separation now?
17    A    No.  We are actually in the process of
18 trying to reconcile to some degree.
19    Q    I wish you well in that regard.
20         Mr. Cooperman, if I heard you correctly,
21 Mr. Cooperman never liked you even before your leave
22 of absence for medical issues.  Is that what I heard?
23    A    No -- yes, you did hear that, and no, he has
24 never liked me.  And it was a well-known fact which

130

Stephanie Mraz - by Ms. Lloyd

1 was stated to numerous employees.
2         When I was to take over the service
3 department, he did not want me to take over that
4 department.  He was spoken to by several people within
5 the office.  The service technician himself spoke on
6 my behalf.  Travis McCann, assistant manager, spoke on
7 my behalf and convinced him to let me take that
8 position.
9         He was going to bring in a person from the
10 Mr. Tile side to do the furniture service department,
11 and I was -- he told me I was then going to train that
12 person.
13         So it's kind of been an ongoing issue.
14 That's my perception of it.
15    Q    And you had the perception that you may get
16 fired even before you ever got the cancer diagnosis?
17    A    I wouldn't say that, no.
18    Q    You thought it was a possibility?
19    A    I'm not sure if his dislike of me would have
20 actually been a reason for him to fire me.  I don't
21 think that.  I think working at Mr. Tile, you always
22 have that feeling of you could be fired at any moment.
23 But -- I couldn't answer that.
24         Could you explain your question a little bit

131

Stephanie Mraz - by Ms. Sutton

1 more?  I think I'm getting lost on it.  Could you
2 repeat the question?  I'm sorry.
3    Q    That's okay.  You answered it.  I think you
4 answered it.
5         MS. LLOYD:  That's all I have.
6         THE WITNESS:  Okay.
7         MS. SUTTON:  I just have one follow-up on
8    that.
9                    - - -
10                 EXAMINATION
11 BY MS. SUTTON:
12    Q    So despite the fact that Mr. Cooperman
13 didn't like you, you had managed to keep a job at
14 Mr. Tile for approximately five and a half years and
15 receive regular raises; is that not true?
16    A    Yes.
17    Q    Did you feel during the time that you worked
18 there that Gary Klingensmith was taking care of you in
19 your capacity as long as you did your job well?
20    A    I wouldn't say taking care of me.
21 Mr. Cooperman was in charge when it suited him to do
22 so.  Basically, he had stepped away from the actual
23 running of the business, and when it suited him and
24 his mood, to be honest, it -- when he didn't like you,

132

Stephanie Mraz - by Ms. Sutton

1  it was a well-known fact.  And when it suited him,
2  then he would -- normal procedure was we were directed
3  and instructed by Gary Klingensmith.  Any decisions
4  were to go through him.  When it didn't suit
5  Mr. Cooperman, then he would step in.  And it was a
6  lack of -- most days you weren't sure who to listen
7  to.  One day it was Mr. Klingensmith was in charge.
8  The next day it was Mr. Cooperman that was making the
9  decisions.  So there was a lot of general confusion
10 regarding --
11     Q    Mr. Cooperman was your boss?
12     A    Yes.  So I'm not sure if I'm actually
13 answering your question.
14     Q    But obviously, you worked there for five and
15 a half years and you felt some sort of protection in
16 terms of your job.  And when you came back from your
17 illness, they wanted -- Mr. Klingensmith had said to
18 you, don't worry about your job.  We're going to hold
19 it for you?
20     A    Yes, that's true.
21          MS. SUTTON:  That's it.
22          THE COURT REPORTER:  Signature?
23          MS. SUTTON:  What she is asking is we can
24     waive signature, meaning that you don't have to

133

Stephanie Mraz - by Ms. Sutton

1  read through every page of the transcript to say
2  that it accurately reflects what you said.
3          Otherwise, what you will do is you'll go
4  down to her office more than likely and spend a
5  half a day reading through the transcript.
6          I think that you'll waive your signature.
7  Does that sound like a good idea?  That's my
8  legal advice on that.
9          THE WITNESS:  Thank you, yes.
10          (Whereupon, at 3 p.m., the deposition was
11 concluded.  Signature waived.)
12                   - - -

134

1 COMMONWEALTH OF PENNSYLVANIA)
2 COUNTY OF ALLEGHENY        )  SS: CERTIFICATE
3          I, Domenica Vogel, a notary public in and for the
4 Commonwealth of Pennsylvania, do hereby certify that
5 the deponent, STEPHANIE MRAZ, was by me first duly
6 sworn to testify to the truth, the whole truth, and
7 nothing but the truth; that the foregoing deposition
8 was taken at the time and place stated herein; and
9 that the said deposition was recorded stenographically
10 by me and then reduced to typewriting under my
11 direction, and constitutes a true record of the
12 testimony given by the said deponent.
13          I further certify that the inspection,
14 reading and signing of the deposition were waived by
15 counsel for the respective parties.
16          I further certify that I am not a relative,
17 employee or attorney of any of the parties or a
18 relative or employee of either counsel and that I am
19 in no way interested directly or indirectly in this
20 action.
21          IN WITNESS WHEREOF I have hereunto set my
22 hand and affixed my seal of office this_____day of
23 _____, 2006.
24 My Commission Expires
   May 16, 2007            _____
                              DOMENICA VOGEL